ALBERT HENGELFELT, APPELLANT, V. FRED EHRMANN,
APPELLEE.

3 N. W. (2d) 576

FILED APRIL 24, 1942.   No. 31320.

*Jack L. Raymond,* for appellant.

*Morrow & Miller, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CAR-
TER, MESSMORE and YEAGER, JJ.

PAINE, J.

Plaintiff brought action to recover damages resulting
from an unlawful discharge and overflow of rain water and
irrigation water upon his land by the defendant. At the
close of plaintiff's evidence, the trial court sustained a
motion to instruct the jury to return a verdict for the de-
fendant. Plaintiff appeals.

The petition alleged the ownership by plaintiff of the
northeast quarter of section 17, township 21 north, range
54 west of the 6th P. M., in Scotts Bluff county, Nebraska;
that said tract in its natural state was arid, slightly rolling
land, the south portion being higher than the north portion;

that it was all irrigable excepting a small triangular piece in the southwest corner thereof; that said land was planted to corn and other crops.

The petition also alleged that the defendant, Fred Ehrmann, was the owner of the southeast quarter of the same section 17, and that his said land is of the same general character as the land of plaintiff, excepting that the general slope of defendant's land is to the west and north, the lowest point being on the west line thereof, it declining in elevation from south to northwest; that the surface drainage and excess irrigation water from the entire quarter-section drains and has a tendency to escape on the west line thereof.

It was further alleged that both tracts of land were under irrigation, each receiving its water from the Gering Irrigation District canal; that just east of the center of the south line of defendant's land a drainage ditch enters defendant's land, and conducts drainage water from a large area to the south; that after reaching a point approximately 460 feet north of defendant's south line, said drainage waters are diverted by a system of laterals, dikes and irrigation ditches in various directions over defendant's land to irrigate the same; that defendant has constructed a dike 750 feet from the west line of his premises, which runs generally straight north and south from the north line of said premises to within about 1,450 feet of the south line of his premises, which is used to force said surface drainage and irrigation waters to the north line of his said premises; that without said dike and laterals and ditches, such waters would flow in a general northwesterly direction, and would leave defendant's land slightly south of the northwest corner thereof; therefore, the natural course of drainage of defendant's premises is obstructed and altered so that said waters are thrown and discharged in a volume upon the lands of plaintiff, beginning at a point about 950 feet east of the southwest corner of plaintiff's premises and extending to a point 250 feet east thereof.

It is claimed that defendant has thereby wilfully and unlawfully, and over the protest of plaintiff, discharged said

surface drainage and excess irrigation waters in a volume onto the lands of plaintiff, and that by reason thereof said waters did on June 5, 1940, wash and flood plaintiff's land, and deposited débris thereon, totally destroying 35 acres of corn, and rendered ten acres of land unfit for further cultivation, and greatly depreciated the value of all of plaintiff's real estate, so that plaintiff has been damaged as follows: Loss of corn crop, $420; destruction of land and depreciation of and damage to plaintiff's real estate, $3,200. Plaintiff prays judgment in the total sum of $3,620.

In his answer defendant admitted the ownership of the land by plaintiff and defendant respectively, and that same is under irrigation; admitted that on or about June 5, 1940, a large volume of surface water flowed over and across defendant's land upon plaintiff's land, and denied every other allegation contained in the petition.

For further answer defendant alleged that, because of lack of normal precipitation, it is necessary to irrigate the lands of both parties to produce good crops; that to irrigate the land it is necessary to construct lateral ditches thereon, with such dikes as are necessary and proper to conduct water by gravity to the higher portions thereof; that the general slope of defendant's land is from south to north; that many years ago defendant constructed upon his land a system of lateral ditches for the purpose of irrigating the same, and in the construction of said system of lateral ditches it became necessary, in the exercise of good husbandry, to construct the dike referred to in plaintiff's petition, which was no higher than was absolutely necessary to conduct water by gravity to several acres of said land near the northwest corner thereof.

Defendant alleges that there is a territory south and east of his land, comprising several square miles, which drains through a natural draw which enters the south side of his land slightly to the east of the center thereof, but at a point about 300 or 400 feet from the south line said draw disappears, and the land becomes flat and level, except that it slopes gently to the north; that on June 5, 1940, a cloudburst occurred in said territory south and east of plaintiff's land,

and this large volume of water flowed down through said draw, and spread out over a large area of defendant's land, and then flowed in the natural course of drainage across plaintiff's land; that defendant was in no way responsible for said flood, or the damage, if any, resulting therefrom to plaintiff's land or crops.

In his reply plaintiff admitted that the normal precipitation from year to year upon and in the vicinity of plaintiff's and defendant's lands is insufficient to produce good crops, and that it is necessary to irrigate said real estate in order to produce profitable crops thereon, and admits that the territory south and east of defendant's land drains through a ditch or draw, which disappears at a point south of defendant's land, and plaintiff denies each and every other allegation contained in the answer. At the close of plaintiff's evidence, the trial court sustained defendant's motion for an instructed verdict in his favor.

The first witness was H. E. Gentry, county surveyor of Scotts Bluff county, who had done engineering work for 24 years, and is a licensed engineer, and had prepared two very excellent maps of the two farms and the land to the south of defendant's quarter.

It shows the drain ditch coming into the defendant's land under the flume of the Gering Irrigation District main canal, then the drain ditch connects with several small laterals running north a little past the center of defendant's quarter, and shows the larger lateral A to the west of the seven smaller laterals.

The testimony indicates that this lateral A has been built up higher at the north end over a period of years until the bottom of the lateral is higher than the surrounding ground. This particular lateral A is from eight inches up to two feet higher than the surrounding ground. Throughout the years defendant Ehrmann has gone in and ditched this lateral with a ditcher, and has done some fresno work, and the result is that this lateral A has increased gradually in height, as the defendant has a little land in his northwest corner that is higher, and so the lateral must be raised to irrigate it.

This lateral A only carries water now to the defendant's land, but it used to carry it to the plaintiff's land too. The plaintiff got his land about 15 years ago, and got water through this lateral, but finally the Gering Irrigation District required the plaintiff to get his water from the east side of his land on his own lateral, and he stopped using this lateral A across the defendant's land.

There appears to be a sharp difference in the evidence as to whether excess water flows off to the north over plaintiff's land, or to the northwest and misses the plaintiff's land.

The evidence shows that on June 5, 1940, a storm came up, and plaintiff says that at that time Ehrmann was drawing water from the irrigation district and irrigating his land; that one Pippet, Ehrmann's hired man, was doing the irrigating, and about 3 o'clock in the afternoon a shower came up, and lasted from half to three-quarters of an hour. The rain on June 5 was described by the witnesses: Delmar Hengelfelt, "a nice ordinary rain;" Kaufman, "just a good rain;" Ralph Campbell, who lives one mile north and half a mile east of Hengelfelt, "just a good heavy rain;" Alex Campbell, who lives 1¼ miles north, "it was just a good rain." But as a result of the rain a combination of the irrigation and rain waters from the Ehrmann farm washed across onto plaintiff Hengelfelt's farm, and plaintiff claims that it caused a large amount of damage on his farm.

The counsel for defendant calls it a rain of cloudburst proportions away off to the south of defendant's land, and that it came down through the draw onto Ehrmann's land, and finally got onto the plaintiff's land. Defendant claims that this flood water went north onto plaintiff's land, but the flow of water was quite a little to the east of lateral A where it crossed onto plaintiff's land. It was a great, wide piece of surface water, covering at least a space of about 500 feet in width, so it could not have been gathered together by any lateral or ditch. The plaintiff himself testifies that the water was going down in great volume, and covered all of the laterals on defendant's land.

The evidence shows clearly that the Gering Irrigation

District canal filled up from this storm, and where it ran on this flume across the old draw, water slopped over from the flume and overflowed into the draw, which was about 15 feet under it, thus adding escaped irrigation water to the surface water and the water flowing in the draw from the south.

There is dispute whether there is any evidence that the rain of June 5 was of cloudburst proportions, but when we realize that, as a result of such rain, the water ran in a sheet 500 feet wide from one farm to the other, such volume could not be produced by "a nice ordinary rain," or it would have happened in the same way with every ordinary rain.

"Overflow water that escapes from the banks of a running stream, and that does not return to its banks, nor find its way to another stream or watercourse, is surface water." *Anderson v. Chicago, B. & Q. R. Co.*, 102 Neb. 497, 167 N. W. 559.

The contention of the defendant is that surface water is a common enemy that every proprietor may fight as he deems best, regardless of its effect on other proprietors adjoining. This was the common-law rule. 67 C. J. 866. This rule is in force in Nebraska, with this modification,—that in fighting surface water the upper proprietor may not accumulate surface waters into a ditch, or drain, and thereby increase the flow, and discharge them in volume on the servient estate, and cannot divert them so they go in a different direction. See *Todd v. York County*, 72 Neb. 207, 100 N. W. 299; *Lincoln Street R. Co. v. Adams*, 41 Neb. 737, 60 N. W. 83; *Jacobson v. Van Boening*, 48 Neb. 80, 66 N. W. 993.

Surface waters may be controlled by the owner of the land on which they fall or originate or over which they flow. He may appropriate to his own use all that falls or comes on his land and refuse to receive any that falls or originates or flows on or over adjoining property. See *Town v. Missouri P. R. Co.*, 50 Neb. 768, 70 N. W. 402; *Norris v. Union P. R. Co.*, 111 Neb. 540, 196 N. W. 924; *Andrews v. Village of Steele City*, 2 Neb. (Unof.) 676, 89 N. W. 739; *Todd v. York County*, 72 Neb. 207, 100 N. W. 299.

"A landowner who is not guilty of negligence may, in the

interest of good husbandry, accelerate surface water in the natural course of drainage without liability to the lower proprietor. *Todd v. York County,* 72 Neb. 207; *Perry v. Clark,* 89 Neb. 812; *Arthur v. Glover,* 82 Neb. 528; *Aldritt v. Fleischauer,* 74 Neb. 66. The quantity of water thus discharged upon the land of an adjoining proprietor may be increased." *Steiner v. Steiner,* 97 Neb. 449, 150 N. W. 205.

"Every proprietor may lawfully improve his property by doing what is reasonably necessary for that purpose, and unless guilty of some act of negligence in the manner of its execution will not be answerable to an adjoining proprietor, although he may thereby cause the surface water to flow onto the premises of the latter to his damage." *Anheuser-Busch Brewing Ass'n v. Peterson,* 41 Neb. 897, 60 N. W. 373. See, also, *City of Beatrice v. Leary,* 45 Neb. 149, 63 N. W. 370.

Now, after discussing surface water, we will consider a watercourse, which is defined by section 31-302, Comp. St. 1929, as follows: "Any depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse." Whether or not water is passing in a natural drain is a question to be determined from the facts of the case. See *Muhleisen v. Krueger,* 120 Neb. 380, 232 N. W. 735.

But, in the case at bar, while a draw more than two feet deep brought in water at the southeast corner of defendant's land, it did not continue across his land as a watercourse, but toward the center it just flattened out, and the water ran wherever gravity naturally took it.

We do not find that this draw became a natural watercourse that ran off from defendant's land to the west, and which would, if lateral A had not been built, have carried this flood water from this storm off the west side of defendant's land and saved it from running north onto plaintiff's land and damaging his crop.

The evidence and maps support the conclusion that this flood water ran directly over and across the small laterals of the defendant, and overran the northern part of defendant's

land, and as surface water flowed from defendant's land onto the plaintiff's land in a stream at least 500 feet wide; that this water rushed onto the plaintiff's land because it was a natural flow of gravity, and not because it was retarded or directed by lateral A, or other laterals, and that, while the defendant admits the damages caused to the plaintiff's land by this great volume of surface water, in which escaping water from the irrigation canal was mingled, yet defendant insists that this damage was caused to the plaintiff without any negligence on the part of defendant.

The trial judge listened to the testimony of all these witnesses, and listened to similar arguments which were made to this court by counsel. The propositions of law involved in this litigation are all well established.

In conclusion, we find that the trial judge, considering the evidence and the law, reached the conclusion that, whatever damage may have been caused by these flood waters, it was not through the negligence of the defendant, and therefore at the close of the plaintiff's evidence sustained a motion instructing the jury to return a verdict for the defendant.

From a careful examination of the pleadings, the bill of exceptions, and the law set out in the briefs, we have reached the same conclusion that was reached by the trial judge, and his disposition of this matter is hereby

AFFIRMED.