[No. 31887. Department One. July 31, 1952.]

LAURELON TERRACE, INC., *Respondent*, v. THE CITY OF SEATTLE, *Appellant*.[1]

[1]Reported in 246 P. (2d) 1113.

*A. C. Van Soelen* and *Arthur Schramm,* for appellant.

*Todd, Hokanson & White,* for respondent.

WEAVER, J.—This is an appeal from an order granting plaintiff a new trial after a jury verdict in favor of defendant. The action was one for damages resulting from the flooding of plaintiff's property. The new trial was granted solely upon the ground that the court erred in giving a certain instruction relating to contributory negligence.

The appellant contends the instruction was a proper one. Respondent argues that it was improper, but that, if we hold the instruction to have been proper, then we

". . . may pass upon and determine all the questions of law involved in the cause presented upon such appeal and necessary to the final determination of the cause. Respondent may present and urge claimed errors by the trial court in instructions and rulings which, if repeated on a new trial, would constitute prejudicial error." 34A Wn. (2d) 23, Rule 16, Rules on Appeal.

Pursuant to this rule, respondent urges that the trial court erred in giving certain additional instructions and in refusing to submit to the jury certain requested instructions.

In *Ellefsen v. Wilt,* 36 Wn. (2d) 56, 217 P. (2d) 318, we said:

"We have held in a long line of cases, beginning at least as early as *Davis v. Gilliam,* 14 Wash. 206, 44 Pac. 119, that *when no other verdict than that rendered by the jury could be permitted to stand,* it is unnecessary to determine whether the trial court erred in giving or refusing to give an instruction. [citing cases]

"Another long line of cases based on the same reasoning holds that *where no other verdict than that rendered by the jury could be permitted to stand,* errors in instructions given or refused are not material and cannot be made the basis for granting a new trial. A number of these cases are cited in *Sellman v. Hess,* 15 Wn. (2d) 310, 130 P. (2d) 688." (Italics ours.) (p. 57)

Before we can examine the propriety and correctness of the instruction relating to contributory negligence and the other instructions given and refused to which complaint is directed, we must, of necessity, determine whether a verdict other than the verdict rendered by the jury could be permitted to stand. We will not needlessly discuss multiple assignments of error relating to instructions, when, construing the evidence in the light most favorable to the party requesting a new trial, it cannot be said that the jury, under proper instructions, could have brought in any other verdict than that which it rendered.

Specifically, we must first concern ourselves with the question of the possible primary negligence of the city, for it would be idle to decide questions of contributory negligence as included in the instructions if the evidence does not disclose primary negligence. If the evidence was insufficient to justify a verdict in plaintiff's favor, it was error for the trial court to award a new trial.

Plaintiff's property is located in the southern portion of a natural watershed within the city limits of Seattle. Although its boundaries vary according to topography, generally the watershed is bounded on the north by east 85th street; on the east by 50th avenue N. E.; on the south by Union Bay; and on the west by 34th avenue N. E. It contains approximately eight hundred twenty acres. The east, north, and west limits slope toward its center. To drain this area of water flowing toward its center from its natural slopes,

a natural stream flowed from the north end of the watershed in a southerly direction, eventually emptying into Union Bay.

The stream ran in an open channel. When it intersected streets it was carried, for many years, by thirty-six-inch covered culverts or pipes, but was otherwise permitted to flow in its natural bed.

In the southern portion of the drainage area, 40th avenue N. E. (running north and south) intersects east 55th street (running east and west), at right angles. Since this intersection is an important one for the purpose of this case, we will, for the sake of brevity, hereafter refer to it as "40-55." This intersection is approximately two thousand feet in a straight line from the point where the stream entered plaintiff's property. The stream, running in a southeasterly direction, was carried under "40-55" by a thirty-six-inch pipe. Numerous exhibits show it as being under the northeast side of the intersection. From there it ran through several properties, under a railroad right of way and Sandpoint way near east 50th street by means of thirty-six-inch pipes, and, as an open stream, entered the east side of the unimproved property later purchased by plaintiff, flowing in a southwesterly direction for about three hundred feet and then turned slightly to the right, leaving the property at a point on 40th avenue N. E.

We now turn to two situations described with much detail in the evidence: first, the sewage and drainage system of the area prior to September, 1948, the date the city commenced revamping the sewage and drainage system; and second, what the city did between that date and February 10, 1949, the date plaintiff's property was first flooded; for we are searching the record in order to find facts constituting actionable negligence on the part of defendant city.

Prior to 1931, all natural drainage of the area was handled by the stream, sometimes described as a rivulet or small creek. In 1931, the city installed some combination storm and sanitary sewer lines to handle the sewage and drain a portion of the storm water from the area. These lines funneled the sewage and some of the storm waters into the

intersection at "40-55." This intersection was the lowest point in the watershed where water could enter the trunk sewer by gravity. At that point, the stream became a part of the sewage system of the city in a rather complex manner.

The stream was carried under the intersection through a thirty-six-inch pipe which came out near the southeast corner of the intersection, from which point the open stream bed carried it.

At or near the intersection were four manholes. Under each was a collection chamber. Just east of the intersection there was an overflow manhole into which a thirty-inch sewer line from the east emptied. From that manhole a twelve-inch line ran into a manhole near the south line of the intersection. From the east manhole there was also an overflow pipe running into the thirty-six-inch culvert which carried the stream. When the twelve-inch line could not handle the flow, a weir *diverted the excess into the overflow pipe and thence to the stream.*

Just east of the intersection there was a manhole serving an eight-inch sewer. From this manhole an eight-inch line ran to the south manhole.

The drainage area to the west was served by a twenty-one-inch sewer which ran into a manhole on the west side of the intersection. This manhole was so constructed that by means of a weir, a ten-inch pipe would conduct the combined sewage and drainage to the south manhole. If the flow into the west manhole became more than the capacity of the ten-inch pipe, the weir *diverted the excess to a twenty-one-inch pipe which crossed the intersection from the west in a southeasterly direction to the stream.*

The fourth manhole was, of course, the south one. In addition to the lines already described as emptying into it, it received drainage from a twelve-inch sewer coming from the north under 40th avenue N. E. The south manhole was the entrance to the 40th avenue N. E. main trunk twenty-four-inch sewer. If there was an overflow from the south manhole, it too returned to the stream.

The evidence shows the convergence, at the south manhole, of pipes capable of carrying forty-two inches of

sanitary sewage and drainage which drains into a twenty-four-inch trunk sewer. Any time the twenty-four-inch sewer was carrying its capacity, all additional water was returned to the stream. Or, in other words, for almost twenty years the stream was an integral part of the sewer system of this particular drainage area and carried all of the drainage north of east 55th street except that which was collected by the existing catch basins and sewer lines and channeled through the intersection at "40-55" into the twenty-four-inch trunk sewer. The stream, in its natural state below the intersection, was at all times sufficient to accommodate all sewage and drainage returned to the stream. There was no evidence presented that the stream ever overflowed its banks under this condition.

This was the condition which existed when plaintiff's predecessor acquired its property in 1946. It is bounded on the west by 40th avenue N. E., diagonally on the north by Sandpoint way, on the south by east 45th street, and on the east by some vacant property to the north and by private homes to the south. The stream crossed the property as we have heretofore described.

In 1947, plaintiff decided to improve the property by building garden-type apartment buildings thereon. Along with problems of future sewering, and a proposed paved public street through the property (which eventually was built over a part of the stream after it had been filled in by plaintiff), plaintiff's officers were concerned about what could be done with the stream. Plaintiff's officers and agents held two conferences with the city engineer. The trial court received statements made by the city engineer, not as evidence of defendant's negligence, but as bearing upon the narrower issue of whether, in following the advice of the city engineer, plaintiff's agents had used due care. The statements were, in the words of the trial court, "just an opinion of some citizen." What the city engineer advised will be taken by us as what any engineer consulted by plaintiff might have advised.

The city engineer stated that plans were completed for the drainage of the entire area, and that, by the time plaintiff

had finished construction, or had gotten under way with construction, the stream would not be a problem. He recommended, however, "for your own satisfaction," that a twelve-inch pipe be laid to carry the stream across plaintiff's property, stating that it would be sufficient to handle the flow of the stream.

Plaintiff commenced construction of its project in October, 1947. Shortly after the second conference with the city engineer, plaintiff laid a fifteen-inch concrete culvert in the open stream bed across its property. At its portal the stream bed was filled in to a depth of four or five feet in order to create a "head." The balance of the creek bed was filled in in March, 1948, and thereafter as the construction progressed. The flow of the stream at that time was equal to the capacity of a six or eight-inch pipe. For the first three hundred feet, the fifteen-inch pipe sloped approximately three per cent. Where the stream changed course on plaintiff's property, a manhole was installed. The stream continued from the manhole through the fifteen-inch pipe laid on a one per cent grade. During the floods which followed, water backed up in this manhole to a depth of six or seven feet. Where plaintiff's fifteen-inch pipe left its property on a one per cent grade, the city continued it on a five per cent slope across 40th avenue N. E. After the floods, plaintiff asked the city to remove this extension. It did so, but the water level at the intake of the fifteen-inch pipe remained the same.

In the fall of 1948, the city began construction of the "40th Avenue N. E. Trunk and Lateral Sewer System" which would drain the entire area and, when completed, eliminate the stream. Its complete description is complicated, and we describe only so much of it as bears upon the problem here.

When completed, the intersection at "40-55" was to be served by a fifty-four-inch pipe which would eliminate the necessity of the overflow pipes from the manholes. To accomplish this, the city built a diversion and overflow chamber immediately south of the intersection. The two existing overflow manholes were connected to it. North of the chamber a thirty-six-inch sewer was started but had

been connected with only a few houses at the time in question. This chamber was connected with a manhole *to the existing twenty-four-inch sewer.* The new fifty-four-inch sewer had not yet reached the chamber from the south. Temporarily, it was necessary to provide for possible overflow from the chamber, just as it was necessary to return water to the stream from the manholes prior to construction of the chamber.

During construction, the city did exactly what it had always done. It returned to the stream the water and sewage which was beyond the capacity of the original twenty-four-inch pipe. At a time when no water was present, the city dug a ditch from the outlet of the new overflow chamber to the stream. In the chamber was a weir. When the capacity of the twenty-four-inch sewer was reached, the weir directed the excess to the ditch, which, in turn, returned the water to the stream. The weir and ditch took the place of the overflow and return system as it existed from the manholes. The ditch was a precautionary device, in the event of heavy rains, much the same as the pipes which emptied into the stream had been precautionary. They prevented the sewers above 55th street from overflowing. After this change was made, and prior to completion of the fifty-four-inch sewer from the south, the stream continued to be called upon to carry the same burden as before, the only difference being that the overflow waters returned to it a short distance below the intersection, instead of at the intersection.

The United States department of commerce monthly climatological summary for February, 1949, introduced by plaintiff, discloses some interesting facts. Mean temperature was below normal. It was the coldest February since 1936. There was 6.82 inches of precipitation. Normal for the month was 3.89 inches. Only two prior Februarys since 1891 had more: 8.10 inches in 1902, and 6.85 inches in 1916. In addition, 10.4 inches of snow fell, when 3.3 inches was normal. This was the heaviest February precipitation since the system was installed in 1931.

Plaintiff's building designated as number 10 was in the northeast portion of its property below the mouth of the fifteen-inch pipe installed by plaintiff in the creek bed.

On February 9th and February 10th, 1.44 inches of rain fell, as well as .06 inches of snow. Water backed up at the mouth of plaintiff's fifteen-inch pipe, the point at which plaintiff had filled in to create a "head," and inundated the basement of building number 10, which housed the central heating plant. For a few days, there was only a trace of precipitation, and then, on February 15th and February 16th, 1.42 inches of rain fell. The basement and heating plant were again flooded. On February 19th, 3.3 inches of snow fell. It rained continuously for twenty-four hours on February 21st, with a total precipitation of 1.89 inches. The next day, .55 inches of rain was added, for a two-day total of 2.44 inches. Needless to say, a further outrage was visited on the oft-violated basement of building number 10. It was for the damage thus suffered that plaintiff sued.

██ Actionable negligence consists of a duty, its breach, and a resulting injury. *Christensen v. Weyerhaeuser Timber Co.*, 16 Wn. (2d) 424, 133 P. (2d) 797; *McCoy v. Courtney*, 25 Wn. (2d) 956, 172 P. (2d) 596, 170 A. L. R. 603. If the city owed or breached no duty to plaintiff, it was not guilty of negligence toward it. Before a municipality is liable for causing an injury, it must appear that some duty, incumbent upon it to perform, has been neglected or has been improperly discharged.

██ A city is liable for flooding property *required to be connected to its sewers,* which, though sufficient when constructed, have become insufficient to carry off the sewage and drainage conducted into them. *Boyer v. Tacoma,* 156 Wash. 280, 286 Pac. 659, 70 A. L. R. 1342; *Tombari v. Spokane,* 197 Wash. 207, 84 P. (2d) 678. We find no fault with this rule. It is simply inapplicable here. Plaintiff was not required to, and did not, connect its sewers to the stream. Nor is there any evidence that the stream was, in its natural condition, or as supplemented by the sewer system in 1931, insufficient as a sewer of the city to carry off sewage and surface water.

■ Several of plaintiff's theories sift down to the claim that a peculiar responsibility was cast upon the city by reason of using the stream as a part of its sewage system. However, in the absence of statute to the contrary, a municipality has the right to discharge its sewers into a stream flowing within its limits, and to use it as a portion of its drainage system, so long as no more water is put into the stream than it could accommodate in its natural condition. 11 McQuillin, Municipal Corporations (3d ed.) 226, § 31.27; 18 *Id.* 529, § 53.136.

It is clear from the evidence that the ratio of sewage volume to drainage was small; and that very little more sewage was drained into the system in February, 1949, than had been drained into it at any time during the previous two years, during part of which time the fifteen-inch pipe was in use by plaintiff.

In *O'Donnell v. Syracuse,* 184 N. Y. 1, 76 N. E. 738, plaintiff claimed that her property, which was down stream from defendant, was flooded after a heavy rain because defendant emptied its sewers into the stream. In holding that defendant was not liable, the court said:

"The plaintiff and the other citizens affected by the flood were no worse off than they would have been if the creek had not been used at all for sewerage purposes, except for the incidental deposit of the sewage matter. The drainage of sewers into the channel, however, did not cause the flood, although, naturally, contributing to the volume of the stream. The flood was an extraordinary and an unusual one, resulting from the natural causes of the action of the elements and of the lay of the land." (p. 16)

■■ Plaintiff argues that, by doing additional paving and surfacing north of 55th street, as well as diverting the ditch into the stream, the city breached its duty to plaintiff, in that the flow of the stream was artificially accelerated and incidentally increased. It is well settled that the flow of surface water along natural drains may be hastened or incidentally increased by artificial means, so long as the water is not ultimately diverted from its natural flow onto the property of another. Annotations 5 A. L. R. 1530; Anno-

tations 36 A. L. R. 1463. A city is not negligent if it increases the flow of water through a natural drainway, due to streets and catchbasins, unless the drainage is increased beyond the capacity of the watercourse in its natural condition. In *Bowling Green v. Stevens*, 205 Ky. 161, 265 S. W. 495, the court said:

"The argument is that the new buildings and streets had the effect of causing to flow into the drain a quantity of water that would have been absorbed by the natural surface of the land. Manifestly, the rights of the lower proprietor are subject to the right of the upper proprietor to use his land in the natural and ordinary way, so long as there is no substantial change in the natural flow of the water. Hence, though the upper proprietor has no right to open or remove natural barriers and turn on lower lands surface water which would not otherwise flow in that direction, he has the right, even by ditches and drains, to drain the surface water from his own land into the channels which nature has provided, even though the quantity of water thrown upon the lower lands is thereby increased. [Citing cases.] The rule has been applied in favor of a municipal corporation and its right to carry off surface water in order to improve the streets and render its territory more suitable for building purposes has been recognized." (p. 162)

There is no evidence that the city was negligent in accelerating drainage by the installation of street paving north of 55th street, and hence it did not violate the rule we have heretofore announced in *Bonthuis v. Great Northern R. Co.*, 89 Wash. 442, 154 Pac. 789, and in *Trigg v. Timmerman*, 90 Wash. 678, 156 Pac. 846.

The city certainly owed a duty to plaintiff not to cast, by artificial means, more water into the stream than it could handle. After diverting into the sewer, by the diversion and overflow chamber, twenty-four inches of drainage, it returned the excess to the stream, as it had done since 1931. There is no evidence that the stream ever overflowed during this period. Whether the evidence was sufficient to show that plaintiff was contributorily negligent in installing a fifteen-inch pipe, or in filling in the stream bed, or in some other regard, we do not decide. We hold, however, that reasonable minds, after hearing and reading the evi-

dence of this case, under proper instructions, could not differ on the proposition that defendant owed no duty to plaintiff which it breached. No verdict other than that rendered by the jury could be permitted to stand.

The order of May 31, 1951, setting aside the verdict of the jury and granting a new trial, is reversed.

SCHWELLENBACH, C. J., MALLERY, GRADY, and DONWORTH, JJ., concur.

