Oliver T. HAFERKAMP and Avalene Haferkamp, husband and wife, Respondents,

v.

CITY OF ROCK HILL, a Municipal Corporation, L. Papin and J. E. Papin, Appellants.

No. 46416.

Supreme Court of Missouri,

Division No. 2.

Sept. 8, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 13, 1958.

Richard K. Nalley, St. Louis, for appellant City of Rock Hill.

William H. Becker, Raymond C. Lewis, Jr., Columbia, Rader, Love & Falzone, Clayton, Clark & Becker, Columbia, of counsel, for appellants L. Papin and J. E. Papin.

J. L. London, St. Louis, Louis L. Hicks, Clayton, for respondents.

STOCKARD, Commissioner.

Appellants L. Papin and J. E. Papin (hereinafter referred to as "the Papins"),

and appellant City of Rock Hill (hereinafter sometimes referred to as "the city") have appealed from a judgment against them in the amount of $9,000 actual and $8,800 punitive damages in plaintiffs' suit for alleged unlawful collection and discharge of surface water upon their property.

Plaintiffs Oliver Haferkamp and his wife, Avalene Haferkamp, are the owners of lots 9A and 10A in Warson Place in the City of Rock Hill in St. Louis County. All, or substantially all, of the two lots are located within a natural watershed of approximately eighteen to twenty acres. Unlike the usual watershed, this one has no outlet, natural or otherwise, leading to an above ground watercourse; instead it has what is termed a "sinkhole" into which the surface water normally accumulates and seeps or enters into the ground. Plaintiffs' expert witness described a sinkhole as an area where "the water [had] dissolved so much of the [underground] limestone that the roof or top of the limestone became so thin as to be unable to carry the weight of the soil above it and it collapsed," leaving a hole or depression in the original surface of the earth. The sinkhole in this case consisted of a large depression approximately 200 feet long, 150 feet wide and 12 feet deep, a substantial portion of which was on plaintiffs' property and which extended to within ten or twelve feet of their house. Water entered the ground through a crevice in the bottom of the depression. Some of the witnesses referred to the entire depression as the sinkhole, as did plaintiffs' expert witness, and some referred to the place in the depression where the water entered the ground as the sinkhole. We will subsequently use the term in the latter sense in order to distinguish between the depressed area and the point of outlet of the water. Plaintiffs' lots are located in the extreme northern end of the watershed and the sinkhole is on their property.

The Papins' land was to the south of plaintiffs' lots but not adjoining, and was higher in elevation. Prior to its development it was "rolling" and was covered with grass, pasture, a few trees and some crops. The watershed in question contained land other than that belonging to the Papins, and all of their land did not lie within the watershed. Prior to the development of their land by the Papins, the surface water from that part of the watershed south of plaintiffs' property normally drained northward and down or through a natural ravine or ditch which was approximately 50 feet wide and 10 feet deep. This ravine or ditch ended near the southern boundary of plaintiffs' property, and the surface water, not otherwise absorbed, drained into the depression and then into the ground through the sinkhole. At the time plaintiffs bought their property in June 1951 the depression and the sinkhole were there and they were aware of them. On that day, or a couple of days thereafter, there was three feet of water in the basement of their house and twelve feet of water in the depression. Mrs. Haferkamp testified that this water came from Warson Place to the west and not from the Papins' property. However, she gave no explanation of what happened to the surface water from the south which would naturally drain toward the sinkhole, and why, in her opinion, none of the water in the depression came from there. Plaintiffs' expert witness testified that in June 1951 the natural flow of the surface water in the watershed was to the sinkhole; that it could not have gone elsewhere; and that testimony that no water was coming from the south toward the plaintiffs' property would be "wrong" and a "mistake."

Parts of Warson Place lay to the north and west of plaintiffs' property, and water from Warson Place Street was piped into the depression through a 12-inch concrete pipe which received surface water from three inlets or catch basins in the street. According to Mrs. Haferkamp it was the water which came through this pipe that caused the twelve feet of water in the depression and the three feet of water in the basement of their house in June 1951. One of plaintiffs' exhibits, a contour map upon

which plaintiffs' expert witness had drawn "the original natural watershed," indicates that substantially all of Warson Place Street is outside the natural watershed of the sinkhole. Plaintiffs admit that the water from Warson Place is brought to the sinkhole pursuant to an easement over their property "for Warson Place Subdivision water."

Shortly after plaintiffs bought their property they built a "manhole" over the sinkhole "to take care of the Warson Place water that was piped in there." The evidence is somewhat indefinite as to when the problem with the Warson Place water was corrected, but plaintiffs admit in their brief that at the time they moved into their home in August 1951, "the water from the Warson Place had been eliminated." Plaintiffs apparently assumed that it was common knowledge how a "manhole" which did not empty into an artificial drain but was built over a sinkhole would dispose of the surface water because they presented no testimony in explanation. It appears that what plaintiffs did was to build a brick wall around the opening or crevice in the ground into which the water normally drained. This wall was 16.5 feet high and the outside diameter of the manhole at the top (based on the appearance in a photograph) was approximately three or three and one-half feet. The water coming from Warson Place was piped through the wall and into the area of the sinkhole enclosed by the wall. Plaintiffs later filled or substantially filled the depression with 600 to 700 loads of dirt. A photograph introduced into evidence indicates that after the dirt was placed in the depression the manhole extended about four or four and one-half feet above the level of the dirt. There is no opening in the manhole other than for the 12-inch pipe from Warson Place except for a 4-inch pipe which is blocked about a foot from the manhole. This pipe apparently was placed there in June 1956, after this suit was filed, but who placed it there and why is not disclosed by the evidence, and there is no explanation of where the pipe leads to, if any place, or why it is blocked.

The Papins started in 1951 to develop on their land what they called the Kroenlein Subdivision. In doing so they built three streets and constructed about 65 houses. In the streets they constructed seven catch basins which drained into a 27-inch concrete pipe. This pipe was laid in the bottom of the natural ravine or ditch extending northward toward the sinkhole into which the unabsorbed surface water would normally drain. That part of the ravine or ditch containing the concrete pipe was then filled with dirt. The pipe extended to a point 12.5 feet south of the southern boundary of Warson Place where it ended, and the water was allowed to run out into the bottom of the northern portion of the natural ravine or ditch, and by following the natural drainage from that point it would run across a portion of lot 7A, across lot 8A and onto the land of the plaintiffs and into the depression, or into what was left of it after it was filled with dirt. It is the accumulated surface water flowing from this 27-inch pipe which plaintiffs contend the defendants wrongfully caused to be precipitated upon their land to their damage.

Mrs. Haferkamp testified that there "really wasn't any water coming from the Kroenlein Subdivision until the [27-inch] pipe was laid," and that the laying of the pipe was started in November 1951 and was completed in January or February 1952. However, her husband testified on deposition that they had lived in their house eight months to a year before the Papins began the development south of them, and that during this period the sinkhole (depression?) filled with water and they had water in their basement every time it rained. If this water did not come from the south there is no explanation as to where it did come from in view of the contention of the plaintiffs that "the water from Warson Place had been eliminated" when they moved into their house.

Plaintiffs introduced into evidence photographs showing a substantial amount of water accumulated in their back yard in the area of the depression, or in what was left of the depression after it had been substantially filled with dirt, and which, according to Mrs. Haferkamp, came onto their land from the 27-inch pipe. The expert witness of the Papins, after being shown a photograph taken before the depression was filled with dirt, but showing the brick manhole surrounded with water, testified on cross-examination that the photograph indicated that "the sinkhole (the actual outlet for water) either was not functioning or it was insufficient," but he, and no other witness, explained how any water, except that piped in from Warson Place, could get through the brick wall to the sinkhole.

Plaintiffs joined the City of Rock Hill as a defendant on the theory that it and the Papins were engaged in a joint enterprise in the development of the land, and that after the construction of the streets and storm sewers they were all turned over to and accepted by the city. When the Papins started the work of developing their land they employed an engineer who was instructed to work with the city engineer and to make whatever changes in the plans he wanted. The plans for Kroenlein Subdivision were prepared by the Papins' engineer and submitted to the governing body of the city. They were then referred by it to the city engineer who did make some changes, and the streets, sewers and drainways or catch basins were constructed by the Papins in strict compliance with the plans as changed by the city engineer. As each street was completed it was "accepted" by the city. The city engineer "approved" the location of the outlet of the 27-inch pipe and he advised that surface water should be handled so that it would go to the sinkhole on plaintiffs' property. John Papin, one of the defendants, granted to the City of Rock Hill an easement for the maintenance

and operation of the 27-inch pipe as a storm sewer.

Both the Papins and the City of Rock Hill contend that the trial court erred in failing to sustain their respective motions for a directed verdict at the close of all the evidence, and that if the trial court did not err in this respect, reversible error resulted in the giving of instruction 1, plaintiffs' verdict-directing instruction, on the ground that it does not correctly state the applicable law in view of the facts and circumstances disclosed by plaintiffs' evidence.

We must take plaintiffs' evidence as true and must give them the benefit of all favorable inferences arising therefrom as well as from the defendants' evidence, and we must disregard all of the defendants' evidence that is in conflict with plaintiffs' evidence or fails to strengthen plaintiffs' case. Clark v. City of Springfield, Mo.App., 241 S.W.2d 100; Layton v. Palmer, Mo.Sup., 309 S.W.2d 561. When the evidence is so considered, a jury could reasonably find that by reason of the development of their land the Papins artificially collected surface water in large quantities in the catch basins of the streets and discharged that water through the 27-inch pipe in such a manner that it would flow onto the lands of the plaintiffs at one place to their damage. However, the evidence, when considered as above stated, also establishes that the 27-inch pipe was laid in the bottom of the natural drainway for surface water from that part of Kroenlein Subdivision lying within the watershed of the sinkhole, and that it was discharged in such a manner that it would then follow the natural drainage for surface water to the sinkhole which was the natural and only outlet for surface water.

In connection with the disposition of surface water this state has long been committed, with certain limitations hereafter mentioned, to what has sometimes

been designated as the "common law rule," see English, The Law of Surface Water As Applicable to Missouri and States Bounded by Large Rivers, 51 Central Law Journal, 360, but perhaps more accurately described as the "common enemy doctrine," which stated in its extreme form "is that as an incident to his right to use his own property as he pleases, each landowner has an unqualified right, by operations on his own land, to fend off surface waters as he sees fit without being required to take into account the consequences to other landowners, who have the duty and right to protect themselves as best they can." Annotation, Modern status of rules governing interference with drainage of surface waters, 59 A.L.R.2d 421. See also Vollrath v. Wabash R. Co., D.C., 65 F. Supp. 766, 769; 3 Farnham on Waters and Water Rights, § 889c; 93 C.J.S. Waters § 114a(2); 56 Am.Jur., Waters § 69; Kinyon and McClure, Interferences with Surface Waters, 24 Minn.Law Rev. 891, 916. Missouri has, however, as has all or substantially all of the other states purporting to follow the common enemy doctrine, modified the harshness of that doctrine. In Polich v. Hermann, Mo.App., 219 S.W.2d 849, 855, it was stated that a landowner "cannot collect surface water into an artificial channel or volume, or precipitate it in greatly increased or unnatural quantities upon his neighbor, to the substantial injury of the latter." In Clark v. City of Springfield, Mo.App., 241 S.W.2d 100, 105, it was stated that "one should not artificially impound or collect surface water and cast it in increased and destructive quantities upon the servient estate to its damage." In the recent case of Blydenburgh v. Amelung, Mo.App., 309 S.W.2d 150, 152, it was stated that "the owner of a dominant estate cannot permit water to collect on his own premises and then discharge it in destructive quantities at one point in a body onto the servient estate." In Young v. Moore, Mo. App., 236 S.W.2d 740, 744, it was stated that "the rights given under the 'common

enemy' doctrine, must be exercised within reasonable limits and not recklessly, so as not to needlessly injure the servient tenements." For other but similar statements by the courts of appeals, see Anderson v. City of Jefferson, Mo.App., 262 S.W.2d 169; Blackburn v. Gaydou, 241 Mo.App. 917, 245 S.W.2d 161; Kiger v. Sanko, Mo.App., 1 S.W.2d 218; White v. Wabash R. Co., 240 Mo.App. 344, 207 S.W.2d 505; Lewis v. City of Springfield, 142 Mo.App. 84, 125 S.W. 824. In Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118, 120, this court stated that "surface water is a common enemy which every man may ward off his land and thus throw it on an adjacent or lower owner, provided he does not, in warding it off, unnecessarily collect it and discharge it to the damage of his neighbor."

We need not attempt here to reconcile these various statements, but it is sufficient to note that the language used clearly indicates that it was never intended that the volume and flow of surface water onto neighboring property could not be increased or accelerated under any circumstance. In those states purporting to follow the common enemy doctrine, where the question of the right of a landowner to collect surface water and discharge it into a natural drainway has been expressly raised, the courts "have developed a qualifying rule which is, in substance, that a possessor of land is not privileged to discharge upon adjoining land, by artificial means, large quantities of surface water in a concentrated flow *otherwise than through natural drainways*" (emphasis added). See the discussion by Kinyon and McClure, 24 Minn.Law Rev. at pp. 916 et seq. The statement of this general qualifying rule varies in the numerous cases, and without attempting to state precisely its limits it may be said that the rule is, in substance, that a landowner in the reasonable use and development of his land may drain it by building thereon sewers, gutters and such other artificial water channels for the purpose of carry-

ing off the surface waters into a "natural surface-water channel" (see Todd v. York County, 72 Neb. 207, 100 N.W. 299, 66 L.R.A. 561) located on his property without liability to the owner of neighboring land, even though such method of ridding his property of surface water accelerates and increases the flow thereof, provided that he acts without negligence, and provided further that he does not exceed the natural capacity of the drainway to the damage of neighboring property. See Hengelfelt v. Ehrmann, 141 Neb. 322, 3 N.W.2d 576; Jorgenson v. Stephens, 143 Neb. 528, 10 N.W.2d 337; Pospisil v. Jessen, 153 Neb. 346, 44 N.W.2d 600; Watters v. National Drive-In, Inc., 266 Wis. 432, 63 N.W.2d 708; Bray v. City of Winter Garden, Fla., 40 So.2d 459; Leiper v. Heywood-Hall Construction Company, 381 Pa. 317, 113 A.2d 148; Armstrong v. Francis Corporation, 20 N.J. 320, 120 A.2d 4, 59 A.L.R.2d 413; Yonadi v. Homestead Country Homes, 35 N.J.Super. 514, 114 A.2d 564; Annotation, 59 A.L.R.2d at page 439; 93 C.J.S. Waters § 117; 56 Am.Jur., Waters, § 73. See also the Annotation, What constitutes natural drainway or watercourse for flow of surface water, 81 A.L.R. 262; Case Note, 19 L.R.A.,N.S., 167, and Annotation, L.R.A.1916F, at page 427, both entitled, Right to hasten flow of surface water along natural drainways; and the annotations in 5 A.L.R. 1530 and 36 A.L.R. 1463, pertaining to the right to hasten the flow of surface water along natural drains by reason of improvements to streets and highways.

Even in jurisdictions purporting to follow the civil law rule pertaining to the interference with surface water, under which, when strictly applied, "the upper landowner can do nothing to change the natural system of drainage so as to increase the natural burden," 59 A.L.R.2d at page 429, the courts uniformly recognize that in the proper development of land, particularly in urban areas, a possessor of land must have the right to make alterations in the natural flow of surface water

necessary to the reasonable improvement of his land, and this is "especially true where the possessor disposes of the surface water by depositing it in existing natural drainways." 24 Minn.Law Rev. p. 920. In City of Bowling Green v. Stevens, 205 Ky. 161, 265 S.W. 495, it was stated that "though the upper proprietor has no right to open or remove natural barriers and turn on lower lands surface water which would not otherwise flow in that direction, he has the right, even by ditches and drains, to drain the surface water from his land into the channels which nature has provided, even though the quantity of water thrown upon the lower lands is thereby increased." See also 59 A.L.R.2d at page 440; Turner v. Hopper, 83 Cal. App.2d 215, 188 P.2d 257; Stouder v. Dashner, 242 Iowa 1340, 49 N.W.2d 859; Goering v. Schrag, 167 Kan. 499, 207 P.2d 391; Wallace v. Schneider, 310 Ky. 17, 219 S.W. 2d 977; Spielberger v. Twelfth Dayton Builders Corp., Ohio Com.Pl., 142 N.E. 2d 561; Coleman v. Wright, Tex.Civ. App., 155 S.W.2d 382; Jarvis v. Cornett, Ky., 257 S.W.2d 524.

The cases we have found pertaining to the limitation of the quantity of surface water which may be collected and discharged pertain to the collection and discharge of surface water into a stream or watercourse in such quantities as to exceed the natural capacity of the stream or watercourse. Sisters of St. Joseph Corp. v. Atlas Sand Gravel & Stone Co., 120 Conn. 168, 180 A. 303; Laurelon Terrace, Inc., v. City of Seattle, 40 Wash.2d 883, 246 P.2d 1113; McCutchen v. Village of Peekskill, 167 Misc. 460, 3 N.Y.S.2d 277; Jefferson County Drainage Dist. No. 6 v. Langham, 124 Tex. 167, 76 S.W.2d 484; 93 C.J.S. Waters § 117; Annotation, 28 A.L.R. at page 1267; Annotation, L.R.A. 1916F, at page 427. We see no reason why such a rule would not be equally applicable to the discharge of surface water through a natural drainway to a sinkhole, and such a rule is really a specific application of the often repeated general state-

ments of our courts to the effect that the common enemy doctrine must be exercised within reasonable limits, Anderson v. City of Jefferson, Mo.App., 262 S.W.2d 169, and not recklessly, Young v. Moore, Mo.App., 236 S.W.2d 740, and that a landowner cannot collect surface water and precipitate it in greatly increased or unnatural quantities upon his neighbor. Polich v. Hermann, Mo.App., 219 S.W.2d 849.

No Missouri case has been found, and none is cited to us, which directly and necessarily rules on the right of a landowner, under our modified common enemy rule, to collect surface water and discharge it into a natural drainway on his land. However, in Cannon v. City of St. Joseph, 67 Mo.App. 367, the city was held liable for collecting surface water and discharging it in a body on the land of the plaintiff, but the court stated that instead of doing what the city did it "might have so conducted the water which it collected * * * that it would have been discharged in a proper way into the ditch where it had theretofore flowed," and that a city "may, by artificial means, conduct the water so collected into the channels of drainage where it had formerly and naturally escaped." See also Lewis v. City of Springfield, 142 Mo.App. 84, 125 S.W. 824, 825, 826. In Young v. Moore, Mo.App., 236 S.W.2d 740, the owner of land sought to drain his land for agricultural purposes by widening a ditch on his land through which surface water normally drained. It was held that he had the right to do so under the common enemy doctrine as well as pursuant to a special statute applicable to drainage for agricultural purposes. In the cases of Tucker v. Hagan, Mo.App., 300 S.W. 301, and Kiger v. Sanko, Mo.App., 1 S.W.2d 218, 221, the defendants were held liable for collecting surface water and discharging it in a body on neighboring property other than by use of natural drainways, and in the Kiger case an instruction was approved which required the jury to find that the defendant collected surface water and discharged it "upon the lands of the plaintiffs at a place where it

would not have naturally flowed." White v. Wabash R. Co., 240 Mo.App. 344, 207 S.W.2d 505, 509, involved the application of a statute pertaining to the duty of railroad companies in the disposal of surface water. However, in the opinion it was pointed out that all the cases relied on to establish liability for the collection and disposal of surface water were those where the landowner collected surface water and discharged it in a large volume upon neighboring property "at a point where there is no natural drain on the servient estate to carry it away."

■ It is clear, although we do not find that the question has previously been directly presented, that the courts of this state have properly and correctly recognized that a distinction does and should exist between the discharge of surface water into a natural drainway on the landowner's property where it would have gone anyway, and the discharge of surface water on neighboring land where it would not naturally have drained. Therefore, within the limits determined by the previously stated general principles, under the facts of this case as disclosed by plaintiffs' evidence, the Papins and the City of Rock Hill, in the reasonable use and development of the land, could drain that part in the natural watershed of the sinkhole, and in doing so could collect surface water thereon in artificial drains and precipitate it into a natural drainway channel thereon where the surface water from the drained area would otherwise naturally go, even though in doing so they might increase and accelerate the flow of the surface water in its natural channel onto the lands of the plaintiffs. We consider that what we have here said is but an application to a specific situation of the general rules previously announced by our courts.

Because of the unusual circumstances of this case we shall follow an unusual procedure of considering first defendants' objections to plaintiffs' verdict-directing instruction rather than their contention that

the trial court erred in denying their motions for a directed verdict.

■ After hypothesizing that plaintiffs were the owners of lots 9A and 10A; that the Papins caused to be constructed the catch basins and pipe mentioned in the evidence by and with the consent and permission of the City of Rock Hill; and that the City of Rock Hill accepted the said catch basins and pipe and thereafter maintained them, the instruction then provided as follows: "* * * and if you further find and believe from the evidence that the plaintiffs' property was damaged by reason of the said construction operation and the said maintenance of the said catch basins and pipe; and if you further find and believe from the evidence that after the said construction, maintenance and operation, surface water was caused to be collected in large quantities in the Kroenlein Subdivision and passed into the said catch basins and pipe, mentioned in the evidence, upon the lot immediately to the south of plaintiffs' property and then upon the plaintiffs' property, if you so find, and thereby increased the volume and rate of flow of such surface water from what it was prior to said construction, operation and maintenance, if you so find, and as a direct and proximate result of the said construction, maintenance and operation of the said catch basins and pipe, plaintiffs' property was damaged and depreciated in market value, then your verdict should be for the plaintiffs and against the defendants."

This instruction authorizes a recovery against the defendants if the jury found that they constructed the catch basins and the 27-inch pipe and collected large quantities of water therein and passed the water upon plaintiffs' property *and thereby increased the volume and rate of flow of such surface water from what it was prior to said construction.* In view of the factual situation disclosed by plaintiffs' evidence, and the law applicable thereto as previously set out, this instruction obviously is erroneous in that it imposes liability on the defendants if they increased in any amount the volume and the rate of flow of surface water in the natural drainway regardless of the fact that plaintiffs' evidence establishes that the amount of surface water was increased by reason of lawful activities of the Papins in developing their property and that the water was deposited in its natural drainway so that it would flow toward the sinkhole, its natural outlet, and regardless of whether or not the increased quantity of water exceeded the natural capacity of the outlet. Under the circumstances established by plaintiffs' evidence, when considered most favorable to them, an increase in the amount of the water discharged into the natural drainway which flowed onto plaintiffs' property did not necessarily create liability on the defendants. Therefore, the instruction permitted recovery by the plaintiffs in the absence of liability and for that reason it was prejudicially erroneous.

Unless we have gathered from plaintiffs' evidence incorrect notions concerning the physical characteristics and the function of the manhole constructed over the sinkhole, it appears that plaintiffs have effectively walled off the natural and only outlet for any and all surface water from the entire watershed. In addition, it appears that they, or their predecessors in title, have appropriated a substantial part of the natural capacity of the sinkhole for surface water from outside the watershed. However, the defendants did not develop these matters at the trial and do not specifically urge them on this appeal, and perhaps there is some reasonable and satisfactory explanation therefor. We shall, therefore, not consider these matters in determining the final disposition of this case.

■ It is apparent from our previous discussion of the applicable law, and the theory of plaintiffs as shown by their verdict-directing instruction, that they proceeded upon an incorrect and erroneous theory of liability on the part of defendants. However, this was the result of a "misadventure upon a mistaken legal theory" as

distinguished from "legal strategy." See Smith v. St. Louis Public Service Co., 364 Mo. 104, 259 S.W.2d 692, and Shafer v. Southwestern Bell Telephone Company, Mo.Sup., 295 S.W.2d 109. The evidence in this case, at least when we do not consider the matters previously mentioned, does not establish that in no event could the plaintiffs make a submissible case against the Papins if the evidence in support of a correct theory was fully developed. We have the tentative opinion, which by no means constitutes a ruling, that plaintiffs' evidence was insufficient to support the contention that the Papins and the City of Rock Hill were engaged in a joint enterprise, within the accepted meaning of that term, and for that reason liability for either actual or punitive damages could not be predicated on that theory alone against either the Papins or the City of Rock Hill for the acts of the other. But after the streets and storm sewers were turned over to and accepted by the City of Rock Hill, if they were, its liability would be determined on the same basis as that of the Papins. Therefore, the evidence in this case does not establish that in no event could the plaintiffs make a submissible case against the City of Rock Hill. Subject to the circumstances mentioned in Smith v. St. Louis Public Service Co., supra, "It is the settled practice of appellate procedure that a case should not be reversed, for failure of proof, without remanding, unless the record indicates that the available essential evidence has been fully presented and that no recovery could be had in any event." Kickham v. Carter, Mo.Sup., 314 S.W.2d 902, 907.

In view of our determination that the plaintiffs should be entitled to develop their evidence in support of a correct theory of liability, it is unnecessary to rule on the contentions that the trial court should have directed a verdict for the defendants.

Appellants raise other objections to plaintiffs' verdict-directing instruction, and their briefs also contain twenty additional points. For the most part a discussion of them here would be only academic in view of the ruling we have already made. In any event, the parties may take into consideration the various matters raised in the briefs if a new trial is had.

For the prejudicial error in giving plaintiffs' verdict-directing instruction, the judgment is reversed, and for the reasons above set forth the cause is remanded.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.

On Motion for Rehearing

PER CURIAM.

In their motion for rehearing plaintiffs contend that we overlooked "that there was a taking of plaintiffs' property without the formality of a condemnation proceeding," and therefore the opinion is in conflict with Stewart v. City of Springfield, 350 Mo. 234, 165 S.W.2d 626, 627. We were not unaware of this contention by plaintiffs, but apparently we erroneously believed that it would be obvious that the result reached disposed of it.

Stewart v. City of Springfield, the only case cited and relied on by plaintiffs, was a suit by riparian owners for damages to their land "arising from the pollution of [Wilson] creek caused by the discharge of the effluent of the Springfield sewer system into the creek." The question on appeal was whether the city had "long since appropriated the use of the creek under its right of eminent domain and the statute of limitations [had] run" against the claim for damages by the riparian owners. The court held that "Such sewer systems have consistently been found to constitute permanent nuisances," that the full damage for the permanent injury had to be assessed in one action, that the statute of limitations commenced to run from the time the in-

jury became apparent, and in that case the claims were barred.

Apparently it is plaintiffs' contention that the collection and discharge of surface water by the defendants constituted a permanent nuisance which resulted in a taking or damaging of their property for public use for which they are guaranteed just compensation by Article I, Section 26, Constitution of Missouri 1945, V.A.M.S. Plaintiffs cite and rely only on Stewart v. City of Springfield which does not pertain to the collection and discharge of surface water but to the pollution of streams by a sanitary sewer. However, assuming, but certainly not deciding, that the wrongful collection and discharge of surface water could under some circumstances constitute a permanent nuisance, as distinguished from a temporary nuisance, see Shelley v. Ozark Pipe Line Corporation, 327 Mo. 238, 37 S.W.2d 518, 519, 75 A.L.R. 1316, and thereby result in a taking or damaging of property in the constitutional sense, and also assuming that plaintiffs would be entitled to maintain suit against the Papins, who do not have or claim to have the right of eminent domain, for an alleged taking or damaging of their property for public use, it is obvious that plaintiffs were not entitled to keep their judgment in the circuit court on that basis. "(I)n order to have a taking or damaging * * * within the meaning of Art. I, § 26, Constitution of Missouri 1945, * * * it is necessary that there must be an invasion or an appropriation of some valuable property right which the landowner has to the legal and proper use of his property, * * *." Hamer v. State Highway Commission, Mo. Sup., 304 S.W.2d 869, 871. Plaintiffs sought damages to their property on the basis that the defendants increased the volume and rate of flow of surface water flowing in the natural drainway and onto their land over and above what it was prior to the construction of the Kroenlein subdivision. But, as pointed out in the principal opinion, under our modified common enemy doctrine defendants were entitled to do this within certain limits without infringing up-

on any property right of the plaintiffs. If defendants' acts in disposing of the surface water were within the permitted limits, there could be no taking or damaging of plaintiffs' property within the meaning of Art. I, § 26, Constitution of Missouri 1945. There is no conflict between the principal opinion and the Stewart case.

Plaintiffs' motion for rehearing or in the alternative to transfer to the court en banc is overruled.