BERTHA SCHOMBERG, APPELLEE, v. DAVID E. KUTHER, APPELLANT.

45 N. W. 2d 129

Filed December 15, 1950. No. 32833.

*Bernard A. Ptak,* for appellant.

*Wagner & Wagner, Frederick M. Deutsch,* and *Daniel D. Jewell,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiff Bertha Schomberg brought this action in equity against the defendant David E. Kuther in the district court for Pierce County to restrain and enjoin the defendant from diverting surface water from the natural course of drainage on his land onto the land of the plaintiff; to compel the defendant to remove dikes and dams made by him, and to replace and fill in any ditches that he may have dug, all of which contributed to and caused the unlawful diversion of such water; and to recover damages alleged to have been sustained by

the plaintiff due to the negligence of the defendant in such respect. The defendant's answer denied generally the affirmative allegations of the plaintiff's petition and, in the nature of a cross-action, charged that the plaintiff, with the assistance of her father, entered upon the defendant's land and built dikes and dams and dug ditches, all of which contributed to and interfered with the natural flow of water therefrom, causing the same to flow over his land to his damage; and prayed for damages. Issues were joined and trial had to the court.

There were two decrees entered by the trial court, the first which was vacated and set aside, and the second, a final decree which was subsequently clarified. Suffice it is to say at this time that the final decree found generally in favor of the plaintiff and against the defendant, and that the allegations of the plaintiff's petition were true. Later in the opinion these decrees will be discussed as occasion requires.

Upon the overruling of the defendant's motion for new trial, the defendant perfected appeal to this court.

For convenience we will refer to the parties as originally designated in the district court.

The plaintiff purchased the northwest quarter and the east half of the southwest quarter of Section 25, Township 26 North, Range 4 West of the 6th P. M., in Pierce County from E. A. Lambrecht December 1, 1936. She resides on this land with her father, brother, and husband. The plaintiff's buildings are located in the southeast corner of the northwest quarter of Section 25. The southeast quarter of the above-described section is owned by the defendant. He has lived on it for 48 years. Previous to defendant acquiring title to this land it was owned by his father who lived on it for 68 years. Immediately north of the defendant's land on the northeast quarter of Section 25 is what is known as the Strasheim land.

In 1912, E. A. Lambrecht's mother, then the owner of the land now owned by the plaintiff, opened a road

along the east side of her property line to the section line south, to meet the county road which runs east to Pierce and is a mail route. At the time this road was opened it was level with the land both to the east and west of it. This road is an ordinary driveway about 20 feet wide. It is flat with no ditches on either side of it, and there is nothing to indicate that there had ever been a ditch through this part of plaintiff's land before the road was made. By usage and erosion this road has been cut down so that it is below the natural ground on either side of it. At the south end of the road the soil is heavy black muck. The defendant testified that the soil at the north end of the roadway for a distance of about 80 rods was a mixture of sand and black loam, and in the south 80 rods was black muck; that the road was graded its full length; and that the north thousand feet or more of the road was immediately west of his field and was lower than his field for not quite 80 rods. Two years previous to this trial the road to the south section line had been graded on two occasions.

The road north of the center of the section swings west from that point and northwest among the plaintiff's buildings to the north section line. It is an ordinary field road.

The surface waters involved in this proceeding originate on 50 to 60 acres of the Strasheim land in the southwest corner of the northeast quarter and 10 acres above the building site on the northwest quarter of the plaintiff's land. The water from the 10 acres on the plaintiff's land flows to the east where it meets some of the water from the 50 to 60 acre watershed on the Strasheim land and flows in the natural draw south onto the defendant's land. There is a natural ditch or draw on the Strasheim land that runs in a southwesterly direction close to the west fence boundary line on said land, south onto the defendant's land a rod or two east of the center of the section, then south and southeast on the defendant's

land. There is another draw on the Strasheim land running generally in a southwesterly direction, and also a draw running in a westerly direction, all converging and draining surface water onto the land of the defendant. The plaintiff's engineer states that the natural draw is 35 to 37 feet east of the center of the section. There is a natural ditch or swale that runs south and southeast on the defendant's land that carries the surface water from the north. This swale or draw is a short distance east of the man-made ditch which we will refer to later, and runs in a southeasterly direction where the water fans out onto the low land of the defendant in the south part of the section.

The defendant's testimony with reference to the natural drainage of the surface water from the northeast quarter and 10 acres on the northwest quarter is to the effect that when this water came from the north, just north of the east-west fence dividing the Strasheim land from his property, the water would proceed west under the west fence line onto the plaintiff's property and south down the plaintiff's roadway, and that the natural ditch about 6 or 8 feet east of the man-made ditch on his property carried the water that drained southwest from the northeast quarter, but was distinct and separate from the natural draw coming down from the north on the Strasheim land close to the west fence line of said land.

Along the north property line of the defendant extending east and west there is a row of boxelder trees located on the Strasheim land about 3 feet north of the fence line. The testimony of E. A. Lambrecht is to the effect that while he lived on the land which is now owned by the plaintiff, the defendant's father dug a ditch and constructed a dike east and west in the line of the boxelder trees, and filled in between the trees and the fence line with brush and dirt. This ditch and dike caused the water that would otherwise flow south from the Strasheim land onto the defendant's

land to be diverted west to the center of the section and onto the Lambrecht land. The Lambrechts filled in this ditch at their property line as often as this kind of construction occurred.

The plaintiff's testimony and that of her witnesses with reference to the drainage of surface water at the time she purchased the land is that the ditch on the northeast quarter, or the Strasheim land, came into the defendant's land just west of a large boxelder tree located 10 to 20 feet east of the center of the section, went east and south, and southeast about one-third of the way across the defendant's farm land, then flattened out. No water came onto her land from the Strasheim land. There is also evidence that during the time the plaintiff has resided on her land the defendant, with the assistance of his family, filled in with brush and dirt between the north fence line of the defendant's property and the boxelder trees, for the purpose of diverting the water that would flow south from the Strasheim land onto the defendant's land to the west near the center of the section.

An engineer's testimony with reference to the natural drainage at the points before mentioned is substantially in accord with the testimony of the various witnesses. He testified that any water north of the plaintiff's building site proceeds east to the natural ditch of a depth of approximately 2 feet below the natural ground on the Strasheim land which comes down from the Strasheim land about 300 feet east of the west property line of that land, and comes out at the southwest corner of the land. This water follows the swale down to that corner and the northwest corner of the defendant's land. The depression or low spot is about 35 to 37 feet east of the center of the section or fence corner, and that is where the east and west dike is in the fence line. The testimony was that prior to the construction of this ditch and dike the water from the northwest corner

of defendant's land went south and southeast over his land.

Testimony adduced in behalf of the defendant is that when Lambrecht closed the drainageway north of the center of the section several years ago the water that came onto the defendant's land formed a ditch 2 feet wide and 1½ feet deep which ran south along his west fence line. In 1939, with the use of a maintainer, the defendant made this ditch wider and deeper and extended it south as close to the west fence line of his property as possible a distance of 876 feet to what is called the "north cross-fence." This ditch was about 3 feet deep. The purpose of this man-made ditch was to take the water, which the defendant claimed had been diverted by Lambrecht, that comes from the Strasheim ditch and passes under the defendant's north line fence just west of the boxelder tree heretofore described. No other water goes into that ditch because there is a natural ditch a short distance to the east of the man-made ditch.

The plaintiff and her witnesses testified that the man-made ditch was constructed in 1940, and at that time it extended south from the center of the section along the property line between the plaintiff and defendant a distance of a little more than 1,000 feet. In the fall of 1941, the defendant extended the ditch 300 feet farther south. In the construction of the man-made ditch the defendant pushed the dirt from the ditch to the east side thereof, and put brush on top of this dirt the full length of the ditch.

The testimony of the plaintiff's engineer is that the man-made ditch extends from the center of the section south, parallel with the defendant's west property line, and there is a dike along the east side of the ditch constructed of brush, tree limbs, and junk. The approximate height of the dike above the natural ground immediately east of it varies from 18 inches to 2 feet. The ground immediately west of the fence line is a foot lower

than the dike and slightly higher than the ground east of the dike. The bottom of the ditch is about 2 feet lower than the natural ground on the west side of the ditch. The dike along the east side of the ditch is about 3 feet higher than the land along the west side of the ditch.

Commencing about the center of the section and running not quite halfway to the south side of the section are a number of ash and large cottonwood trees and brush growing along the fence line which divides the plaintiff's and defendant's land. To the east of the trees the defendant's land is cultivated. At the approximate south end of the trees and to the east thereof the defendant's land is pasture and hay meadow. The south cross-fence which is 178 feet south of the north cross-fence is along the north side of the defendant's meadow, and north of the meadow is a pasture which is between the farm land and the meadow.

The defendant's testimony is that two or three years before the man-made ditch was constructed a large cottonwood tree fell across east on his land, between the north cross-fence and the south cross-fence. The man-made ditch ended north of the fallen cottonwood tree. This cottonwood tree was 26 feet in length and 2 feet in diameter. The plaintiff's testimony is to the effect that the cottonwood tree fell across onto the defendant's land in 1943, and the defendant, by the use of dirt, tree branches, and limbs, created a dam which blocks the water coming from the north of this dam. The defendant testified that the log of the cottonwood tree was crooked, and there was considerable space under it. He cut off the top of the tree and placed some limbs loosely along the west side between the log and the fence.

The plaintiff's engineer testified that about 50 feet below the cottonwood dam the defendant constructed a dirt and brush dam in the shape of a horseshoe which connected with the cottonwood dam. There is a sand

deposit on the plaintiff's driveway which starts about 50 feet north of the cottonwood tree dam. There is a sand deposit on the defendant's land which is much longer, and extends from the cottonwood dam southeast into his pasture. The man-made ditch had a rapid run-off and a high grade, and there was nothing to hold the water back from the north until it reached the log dam.

The plaintiff's testimony is that due to the manner in which the man-made ditch was dug and the dike and dams were constructed, and due to the elevation of the ground in that vicinity, when it rained or when snow melted the water that came down the man-made ditch ran across the property line between the plaintiff and defendant onto the plaintiff's roadway 50 feet north of the cottonwood log and south on the plaintiff's road for 20 or 30 rods, washing dirt from the roots of trees and depositing sand and silt on the plaintiff's driveway and making it impassable. This caused the plaintiff to use the driveway to the north section line, and if that was impassable, to stay at home, and on occasions to use a horse to get to the mailbox on the south section line. There is also evidence that the defendant dug a trench under the hogtight fence approximately 50 feet below the log dam which permitted the water to flow onto the plaintiff's land at that point. This the defendant denies. Further testimony of the plaintiff is that the water that would go under or around the cottonwood dam would also flow onto her land because of the horseshoe dam.

The trial court viewed the premises.

The court, on April 16, 1948, entered a decree directing and ordering the defendant to remove the dam at the mouth of the man-made ditch, the cottonwood tree trunk across the ditch, and the dike along the east edge of the ditch, and to close up the openings cut under or through the division line fence between the respective lands of these litigants; to clean out the lower end of

the ditch, and to allow henceforth the surface waters discharged through the said ditch to proceed and seek their natural drainage; and that the defendant be perpetually enjoined from raising the east bank of the dike of the man-made ditch above the west bank or dike, and from in any manner diverting the water from the man-made ditch onto the land of the plaintiff to the west thereof, or in any way obstructing or interfering with the flow of the water through the ditch, and thence in its natural course of drainage. After the entry of this decree the defendant filed a report to the effect that he had strictly complied with the terms of the decree. Shortly thereafter the plaintiff filed an affidavit in indirect proceedings to compel the defendant to show cause why he should not be cited for contempt of court. The basis of the plaintiff's claim was that the defendant failed to abide by the terms of the decree in not lowering the grade on the east side of the man-made ditch to the elevation and grade of the surrounding area, and wholly failed to clean out the lower end of the ditch.

Hearing was had to the court. The testimony in behalf of the plaintiff was that the defendant scraped the dirt out of the man-made ditch and leveled dirt from the east dike, pushing such dirt into the natural ditch to the east of the man-made ditch. In addition, the defendant failed to farm an area 50 to 100 feet along the entire length of the man-made ditch on the east side thereof, and had not been cultivating that land except that some sudan grass had been planted in that area, but generally weeds were permitted to grow to a height in some instances of 6 feet. This caused the accumulation of silt and other debris and retarded the surface water that would normally flow to the south and southeast over the defendant's land, and caused it to flow west onto the plaintiff's land in greater quantity than before. The evidence of the defendant's witnesses was to the effect that he had substantially complied with

the court's original decree of April 16, 1948.

It appears from the cross-examination of the plaintiff's witnesses that after the log dam had been removed, the water went across the plaintiff's land south of that point, and none of it above, although there is testimony on the part of the plaintiff's engineer that water would come across from the defendant's land above where the cottonwood log dam had been, and also below it.

The defendant was discharged from the citation for contempt.

On December 3, 1949, the trial court set aside the decree of April 16, 1948, for the reason that this decree was not sufficiently clear as became apparent to the court upon the petition of the plaintiff in endeavoring to enforce the mandatory injunction against the defendant under said decree. The court found generally in favor of the plaintiff and against the defendant, that the allegations of the plaintiff's petition were true, and plaintiff was awarded damages in the amount of one dollar. The court then made a finding setting forth a plan and solution of the problem for the best interests of the parties, and the plan was subject to acceptance of the parties, especially the defendant. The decree provided that in the event the interested parties voluntarily accepted the plan the district court would retain jurisdiction for the purpose of enforcing the agreement. There was nothing compulsory or coercive in this portion of the decree. The defendant and his wife did avoid its effect by the simple expedient of not accepting it.

The decree of December 3, 1949, by a decree entered December 29, 1949, was amended by the trial court in the following respect: " 'In the event that the defendant, David Kuther fails to consent as aforesaid (in conformity with the findings in the decree of December 3, 1949), then it is adjudged and decreed that he be permanently enjoined from further use of the "man-made ditch" referred to in the findings of April 16, 1948, and

from using tree trunks, brush or dikes in any manner diverting the natural drainage of waters upon his premises in any manner that will cause unnecessary damage to the plaintiff, and that the defendant David Kuther be required to completely remove the east bank of said ditch and all embankments on his premises east thereof which would divert flow into the present ditch, and that the excavated portion of said ditch be filled and kept at the level of the adjoining ground in such manner that waters will not be diverted into the present channels of said man-made ditch and will be perpetually allowed to drain across his premises in their natural manner.'" It was further decreed that the findings of April 16, 1948, be adopted by reference, and that the record show that the decree of December 3, 1949, was entered pursuant thereto.

The defendant assigns as error that the decree of the trial court is not sustained by sufficient evidence. This contention is based on the testimony of the plaintiff and some of her witnesses in the contempt proceedings, that after the decree of April 16, 1948, was entered and complied with by the defendant, no water flowed from the defendant's land onto the plaintiff's land north of the place where the log dam was constructed, but that water did cross over onto the plaintiff's land about 20 rods south of that point. Further, this evidence corroborates that of the defendant's engineer to the effect that had the cottonwood tree been promptly removed, the plaintiff would have received all of the excess water from the man-made ditch and other drainage water from the natural draw east of the man-made ditch for the reason that the defendant's land south of the south end of the man-made ditch slopes southwesterly and the surface water from the defendant's land at a distance of 1,054 feet south of the center of the section flows in a southwesterly direction, and due to the terrain this water by natural force of gravity would flow southwest onto the plaintiff's driveway.

The trial court found that south· of the cottonwood trees on the half section line between the plaintiff's and defendant's lands, there is some drainage from the defendant's land to the plaintiff's land, but none from the plaintiff's land to the defendant's land.

The defendant contends that the decree of the trial court is contrary to law. Among the reasons given are the following: That the surface water from the Strasheim land naturally flows onto the defendant's land near the northwest corner thereof and has created a ditch or channel as it flows under the divison fence line upon defendant's land which the trial court, by the decree, requires the defendant to keep filled. Further, the defendant contends that the decree requires that the water be perpetually allowed to drain across the defendant's premises in its natural course which is contrary to law for the reason that the defendant does not have to accept any water coming off the Strasheim quarter. He may legally put a dike across his north property line and refuse to accept any· of the surface water flowing south from the Strasheim quarter section. Thus the decree prevents the defendant from doing what he has a legal right to do.

Applicable here is the following: "When an action in equity is appealed, it is the duty of this court to try the issues de novo and to reach an independent conclusion without reference to the findings of the district court. But in a case wherein the court has made a personal examination of the physical facts, and where, in the same case, the oral evidence in respect of material issues is so conflicting that it cannot be reconciled, this court will consider the fact that such examination was made and that such court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." Probert v. Grint, 148 Neb. 666, 28 N. W. 2d 548.

"The trial court is required to consider any compe-

tent and relevant facts revealed by a view of premises as evidence in the case, and a duty is imposed on this court on review of findings made by the trial court to give consideration to the fact that the trial court did view the premises; provided, that the record contains competent evidence to support the findings." Columbian Steel Tank Co. v. Vosika, 145 Neb. 541, 17 N. W. 2d 488.

The defendant relies on the following rule of law: "A proprietor may defend himself against the encroachments of surface water by embankment or dike or otherwise and will not be liable in damages which may result from the deflection and repulsion defended against, provided that the proprietor in making defense on his own land himself exercised ordinary care and provided he so uses his own property as not to unnecessarily and negligently injure another." Skolil v. Kokes, 151 Neb. 392, 37 N. W. 2d 616. See, also, Robinson v. Central Neb. Public Power & Irrigation District, 146 Neb. 534, 20 N. W. 2d 509; Churchill v. Beethe, 48 Neb. 87, 66 N. W. 992, 35 L. R. A. 442; Town v. Missouri P. Ry. Co., 50 Neb. 768, 70 N. W. 402; Todd v. York County, 72 Neb. 207, 100 N. W. 299, 66 L. R. A. 561.

"Every proprietor may lawfully improve his property by doing what is reasonably necessary for that purpose, and unless guilty of some act of negligence in the manner of its execution will not be answerable to an adjoining proprietor, although he may thereby cause the surface water to flow onto the premises of the latter to his damage." Anheuser-Busch Brewing Assn. v. Peterson, 41 Neb. 897, 60 N. W. 373. See, also, City of Beatrice v. Leary, 45 Neb. 149, 63 N. W. 370, 50 Am. S. R. 546.

However, the foregoing rule is a general one and subject to another common-law rule that a proprietor must so use his own property as not to unnecessarily and negligently injure his neighbor. See, Lincoln & B. H. R. R. Co. v. Sutherland, 44 Neb. 526, 62 N. W. 859; Snyder v. Platte Valley Public Power & Irrigation District, 144

Neb. 308, 13 N. W. 2d 160, 160 A. L. R. 1154.

"A proprietor may not collect surface waters on his estate into a ditch or drain and discharge them in a volume on the lands of his neighbor, nor can he divert them so they go in a direction different from the natural flow." Hengelfelt v. Ehrmann, 141 Neb. 322, 3 N. W. 2d 576. See, also, Pint v. Hahn, 152 Neb. 127, 40 N. W. 2d 328; Todd v. York County, *supra.*

This case involves surface water, defined as follows: "Surface water is that which is diffused over the surface of the ground, derived from falling rains or melting snows, and continues to be such until it reaches some well-defined channel in which it is accustomed to and does flow with other waters, * * *." Jack v. Teegarden, 151 Neb. 309, 37 N. W. 2d 387.

It is apparent from the evidence that the surface water here involved did flow in a well-defined course in a ditch from the Strasheim land south under the division line fence between that land and the defendant's land as heretofore described, thence south in a southeasterly direction in a ditch east of the man-made ditch, where this water subsequently fanned out over the low bottom land of the defendant, thence south across the section line into the Willow Creek valley, which is about one-quarter of a mile south of the south line of Section 25.

"Where surface water resulting from rain and snow flows in a well-defined course, whether it be a ditch, swale or draw in its primitive condition, its flow cannot be arrested or interfered with by a landowner to the injury of neighboring proprietors." Leaders v. Sarpy County, 134 Neb. 817, 279 N. W. 809. See, also, Seibold v. Whipple, 143 Neb. 167, 9 N. W. 2d 154.

We conclude the defendant collected the surface waters on his estate into the man-made ditch in such a manner as to discharge them in volume onto the lands of the plaintiff, and by his actions and negligence he diverted the surface waters so that they would flow in a direction

different than the natural flow. See, Hengelfelt v. Ehrmann, *supra;* Pint v. Hahn, *supra.*

"For such an injury injunction is the proper remedy, and equity looks to the nature of the injury inflicted, together with the fact of its constant repetition, or continuation, rather than to magnitude of the damage inflicted, as the ground of affording relief." Skolil v. Kokes, *supra.*

"Equity will afford relief by injunction against a continuing injury to land caused by an unlawful discharge of * * * surface waters by an adjoining landowner." Pint v. Hahn, *supra.* See, also, Jack v. Teegarden, *supra;* Seibold v. Whipple, *supra.*

In view of our holding, we deem other assignments of error need not be discussed.

For the reasons given in this opinion, the decree of the district court is affirmed.

AFFIRMED.