WILLIAM A. NICHOL, SR., ET AL., APPELLANTS, v. ADA A. YOCUM ET AL., APPELLEES, ARTHUR PIEPER, INTERVENER-APPELLANT.

113 N. W. 2d 195

Filed February 9, 1962. No. 35096.

*Frank Glebe,* for appellants.

*Neighbors, Danielson & Van Steenberg,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

CARTER, J.

This is an action brought in the district court for Scotts Bluff County to obtain a mandatory injunction to compel defendants to remove an earthen embankment which is alleged to have obstructed the natural flow of surface waters and to permanently enjoin any interference with the natural flow of such waters. The trial court found for the defendants and plaintiffs and intervener have appealed.

The plaintiffs are the owners of the south half of the southeast quarter of Section 11, Township 22 North, Range 56 West of the 6th P. M., Scotts Bluff County, Nebraska. The intervener, Arthur Pieper, is the owner of the north half of the southeast quarter of said Section 11. The defendants, Ada A. Yocum, Arthur L. Yocum, and Maybelle Luxa, are the owners of the southwest quarter of said Section 11. The defendant A. C. Smith Company, Inc., is the contractor engaged in constructing the embankment at the time the suit was

brought. Defendant Reuben Herdt is an employee of A. C. Smith Company, Inc. We shall hereafter refer to the owners of the above-described lands as plaintiffs, intervener, and defendants, respectively.

The lands owned by plaintiffs and intervener join the land owned by the defendants on the east, there being a common boundary line between them. There is a railroad grade which crosses the northeast corner of plaintiffs' land and continues through intervener's land in a northwesterly direction. A concrete irrigation lateral enters the land of the intervener from that of the defendants at a point approximately 400 feet north of the southwest corner of intervener's land. This irrigation lateral follows a southeasterly course to intervener's south property line, thence east to the railroad grade. There is no flow of surface waters to the south from above this irrigation lateral.

The land of the plaintiffs slopes to the north and west. The lands to the south of those owned by plaintiffs and defendants slope to the north and generally to the west. Along the south line of defendants' land is a second irrigation lateral partly earthen and partly concrete, which conveys irrigation water to the south part of defendants' land. Because of this lateral, surface waters directly south cannot flow upon defendants' land except in times of heavy floods. Surface waters directly south of the defendants' land follow this irrigation lateral to the southeast corner of defendants' land, where they turn north onto the land of the plaintiffs.

The surface waters originating south of defendants' and plaintiffs' lands, as well as those originating on plaintiffs' land, flow to the north and thence to the west toward the northwest corner of plaintiffs' land.

The evidence shows that on the common boundary line between the lands of plaintiffs and the intervener and that of the defendants there is low ground for a distance of approximately 900 feet through which the aforesaid surface waters flowed upon the land of the defendants

prior to the construction of the embankment involved herein. The evidence also shows that defendants' land is lower than the land of the plaintiffs and the intervener. Prior to the construction of the embankment the waters flowed from plaintiffs' and intervener's land onto that of the defendants and ponded in a low area in the southwest quarter of defendants' land. This low area on defendants' land becomes covered with water to as much as 40 acres, depending upon the amount of rainfall and surface runoff. There is no outlet from this low area and water stands upon it until it evaporates or percolates into the soil. There is evidence that in most years crops have been damaged or lost because of this accumulation of water on defendants' land.

With this situation existing the defendants constructed an embankment across the 900 feet of low ground on the east boundary of their land across the area where surface waters were wont to flow in the state of nature from plaintiffs' and intervener's lands onto those of the defendants. On June 21, 1959, after a heavy rainfall, the embankment then existing caused water to be backed up and ponded on plaintiffs' land to the extent of approximately 19 acres and on that of interveners to the extent of 3½ acres. The evidence is clear that, if the embankment under construction is completed, plaintiffs' land in times of heavy rainfall will be covered to the extent of 35 acres or more to the damage of plaintiffs' land and crops growing thereon. It is not questioned that the land here involved is excellent irrigated land. Plaintiff William A. Nichol, Sr., estimated the value of his land at $500 per acre.

There is little conflict, if any, in the evidence heretofore recited. The defendant Arthur L. Yocum testified that he had two purposes in constructing the embankment. One purpose was to construct an irrigation lateral on the embankment across the low ground so that he could irrigate the south part of his land from his north lateral. This was clearly for convenience only,

since the south part of his land could all be irrigated from his south lateral. It was shown by the evidence of an engineer that proper construction could provide for the passage of the surface waters under the proposed irrigation lateral, but the defendant refused to agree to any such construction. There is evidence that plaintiff William A. Nichol, Sr., and intervener protested the construction of the embankment to the defendant Arthur L. Yocum, who replied: "I have taken this flood water for all of these years, and I'm going to let you take it now." The other purpose was admittedly to ward off these surface waters for the benefit of the land of these defendants. We think it is clear that the motivating purpose in constructing the embankment was to stem the flow of surface waters from the lands of plaintiffs and intervener to the land of the defendants for the benefit of the defendants.

The parties are in agreement on many aspects of the case. They are in agreement that the waters involved are surface waters derived from rainfall. Admittedly there is no watercourse, live stream or otherwise, as distinguished from mere surface drainage. It is agreed, also, that the waters in question flowed across the lands of plaintiffs and intervener onto defendants' land in the past and would continue to do so but for the embankment constructed by the defendants. It is further agreed that the embankment when constructed will hold these surface waters on the lands of plaintiffs and the intervener, and cause waters to pond thereon during and after floods caused by heavy rains. The dispute arises largely over the law applicable to surface waters as it relates to the conditions shown by the evidence about which there is little dispute. A review and rationalization of the authorities as they relate to surface waters and the rights and duties of landowners in respect thereto appears necessary.

It is the contention of the defendants that the waters involved are surface waters, that surface waters are a

common enemy, which implies that the owner of land may fight it as he will without liability therefor. That surface waters are a common enemy has been stated in several opinions of this court. See, Lincoln & B. H. R. R. Co. v. Sutherland, 44 Neb. 526, 62 N. W. 859; Snyder v. Platte Valley Public Power & Irr. Dist., 144 Neb. 308, 13 N. W. 2d 160, 160 A. L. R. 1154; County of Scotts Bluff v. Hartwig, 160 Neb. 823, 71 N. W. 2d 507; Turnell v. Mahlin, 171 Neb. 513, 106 N. W. 2d 693. This court has also held that the law as to surface waters is controlled by the common law, with certain modifications and exceptions. Jorgenson v. Stephens, 143 Neb. 528, 10 N. W. 2d 337; Muhleisen v. Krueger, 120 Neb. 380, 232 N. W. 735; Town v. Missouri P. Ry. Co., 50 Neb. 768, 70 N. W. 402. The implication is that the common enemy doctrine is a principle of the common law. We submit that it is not.

This court has defined surface waters as waters which appear upon the surface of the ground in a diffused state, with no permanent source of supply or regular course, which ordinarily result from rainfall or melting snow. Courter v. Maloley, 152 Neb. 476, 41 N. W. 2d 732. This appears to be the common-law definition of surface waters. At common law, and under the law of this state as well, a landowner may by embankment, or dike, or otherwise, defend himself against encroachment of such diffused surface waters and will not be liable in damages which may result from its deflection or repulsion. This statement of the law has been modified by this court to the extent that such owner, in defending against such diffused surface waters, must do so without negligently or unnecessarily injuring another.

But under the common-law rule, when diffused surface waters gather in volume in velocity and flow into a natural depression, draw, gulch, or drainway, the right to drain along natural courses was regarded as sound doctrine. They partake of the nature of rivulets and small streams to which riparian rights do not attach.

In other words, the common law recognized that lower lands are under a natural servitude to receive the surface water of higher lands flowing along accustomed and natural drainways. Such waters are not, therefore, subject to the rule that they may be dammed, repelled, or diverted without liability as in the case of diffused surface waters. More important to the present case is the invalidity of the assertion that all surface waters are a common enemy, and also the implication that they may be defended against by the landowner as he will without liability.

The history of the asserted common enemy doctrine is stated in 3 Farnham, Waters and Water Rights, § 889b, p. 2589, as follows: "As will be seen in the succeeding section, a rule has been stated as the antithesis of the civil-law rule that surface water is a common enemy which may be fought at pleasure. And, because it was the antithesis of the civil-law rule, some courts, without investigation, have announced that it was the common-law rule. And, under the influence of this doctrine, broad statements are to be found, such as that contained in Jordan v. Benwood (42 W. Va. 312, 26 S. E. 266, 36 L. R. A. 519, 57 Am. S. R. 859), as follows: Under the common-law rule as to surface water, each owner may fight surface water as he chooses, and he may use it all, divert it away from the lower land, may prevent its invasion of his land and thus dam it up on his neighbor's land, or he may, in the use of his land, cause it to flow differently upon his neighbor's land from what it did before. That statement is a very good illustration of the peril of adopting general statements as rules of decision. As has been seen from the preceding sections, there is no general right to fight surface water as a common enemy. All rightful acts with regard to it are confined within very narrow limits which have not yet been fully defined. And to state generally that such water is a common enemy, or that there is a right to fight it at common law, cannot be otherwise than misleading."

In section 889d, p. 2599, of the same text it is said: "The question of the right to obstruct a natural drainage channel has been needlessly complicated with the further question whether or not a water course existed. The rules with respect to water courses form a distinct class by themselves, and were formulated to conserve the interests of the riparian owners. On the other hand, the question of drainage involves, not only the welfare of the individual landowner, but also that of the community in so far as its healthfulness and prosperity depend upon relieving land of stagnant water and improving its productiveness. Before man owned any parcel of land nature had impressed upon it certain characteristics. So far as these can be changed without interfering with the use or enjoyment of neighboring property, they may be changed at will. But, so far as one parcel has been subjected by nature to a servitude in favor of an adjoining parcel, the enjoyment of which will be materially injured by destroying the servitude, it would seem that the rule by which a purchaser of property is bound by its condition when he acquires title would prevent the destruction of such servitude. In order to be within the operation of this rule, the servitude must be clearly and permanently impressed upon the property so as to be plainly visible to the intending purchaser. Under this rule, the great weight of authority is in favor of the proposition that a lower proprietor cannot place any obstruction in an obvious drainage channel which has been formed by nature and carries the water from a higher to a lower estate."

What is known as the common enemy doctrine originated in Massachusetts and is no part of the common-law rule. It has been adopted in some other states, generally with exceptions and modifications. While it is sometimes referred to in our cases as the common-law rule, it actually has no relation thereto. 56 Am. Jur., Waters, § 69, p. 552. This court has stated in several cases that surface waters are a common enemy, imply-

ing an approval of the common enemy doctrine, but we find no case specifically adopting the common enemy doctrine as such as the declared law of this state. It was assumed, and we now think incorrectly, that the common enemy doctrine originated in the common law dealing with surface waters. We now hold that the common enemy doctrine is not the law of this state, and that the true doctrine of the common law in regard to surface waters is as a general rule in force and controls in this state. See, Jorgenson v. Stephens, *supra;* Muhleisen v. Krueger, *supra;* Town v. Missouri P. Ry Co., *supra.*

This leads us to the conclusion that diffused surface waters may be dammed, diverted, or otherwise repelled, if necessary, and in the absence of negligence. But when diffused surface waters are concentrated in volume and velocity and flow into a natural depression, draw, swale, or other drainway, the rule as to diffused surface waters does not apply. The proper rule in such cases is generally stated in 56 Am. Jur., Waters, § 75, p. 562, as follows: "The great weight of authority, however, is to the effect that both under the civil-law rule as to surface waters and under the so-called 'common-law' or 'common enemy' rule, a natural drainway must be kept open to carry the water into the streams, and as against the rights of the upper proprietor, the lower proprietor cannot obstruct surface water when it has found its way to and is running in a natural drainage channel or depression. Thus, it has been held that it is the duty of a lower landowner who builds a structure across a natural drainway to provide for the natural passage through such obstruction of all the water which may be reasonably anticipated to drain therein, and that this is a continuing duty."

At common law the right to drain surface waters into depressions, draws, swales, and drainways which existed in the state of nature was recognized. Lower lands are, at common law, under a natural servitude to receive the

surface water of higher lands flowing along natural depressions on the surface of the ground. This is so, whether or not a live watercourse occupies the natural course. In Bellows v. Sackett, 15 Barb. 96 (N. Y.), the common-law rule is stated as follows: "The rule of the civil law was, that 'rain water or other waters which have their course regulated from one ground to another, whether it be by the nature of the place, or by some regulation, or by a title, or by an ancient possession, the proprietors of the said grounds cannot innovate any thing as to the ancient course of the waters. Thus he who has the upper grounds cannot change the course of the water either by turning it some other way or rendering it more rapid, or making any other changes in it to the prejudice of the owner of the lower grounds.' (Domat, 616, Cushing's ed.) This is substantially the rule of the common law, and it applies, I apprehend, equally to flowing streams and descending rains, though not to streams flowing beneath the surface, the courses and fountains of which do not lie open to observation and cannot be traced." See, also, Beer v. Stroud, 19 Ont. 10; Dayton v. Drainage Commissioners, 128 Ill. 271, 21 N. E. 198. The rule was extended at common law so as to permit a hastening of the flow of the waters. 3 Farnham, Waters and Water Rights, § 889b, p. 2587.

We point out that the owner of land is in the position of an owner of all surface waters which fall or arise on it, or flow upon it. He may retain them for his own use. He may change their course on his own land by ditch or embankment, but he cannot divert their flow upon the lands of others except in depressions, draws, swales, gulches, or other drainways through which such waters were wont to flow in a state of nature. Schomberg v. Kuther, 153 Neb. 413, 45 N. W. 2d 129; Seibold v. Whipple, 143 Neb. 167, 9 N. W. 2d 154; Ricenbaw v. Kraus, 157 Neb. 723, 61 N. W. 2d 350.

This court has recognized the right of an upper pro-

prietor to drain surface waters through a well-defined natural course, whether the course be ditch, swale, or drain in its primitive condition, and that such flow cannot be arrested or interfered with to the injury of neighboring proprietors. Turnell v. Mahlin, *supra;* Town of Everett v. Teigeler, 162 Neb. 769, 77 N. W. 2d 467; Bussell v. McClellan, 155 Neb. 875, 54 N. W. 2d 81; Mader v. Mettenbrink, 159 Neb. 118, 65 N. W. 2d 334; Keim v. Downing, 157 Neb. 481, 59 N. W. 2d 602. The foregoing cases, and others as well, are consistent with the common-law rule, although they appear to be treated as exceptions to the common enemy doctrine. In other words, the court has resorted to exceptions to what was thought to be the common-law rule when, in fact, resort to exceptions was not required if the true common-law rule were properly applied.

The evidence shows that surface waters flowed through a natural drainway onto defendants' land only in case of heavy rainfall and runoff. While the flow of water in such a drainway may be temporary and occasional, the course which it uniformly takes is not temporary or occasional. The latter is, of course, the controlling factor. Briscoe v. Drought, 11 Ir. C. L. 250; Beer v. Stroud, *supra.*

The evidence shows that the surface waters flow from plaintiffs' and intervener's lands onto defendants' land through a natural depression or drainway. They thereafter pond on defendants' land in a low basin having no natural outlet. The fact that there is no natural outlet from the servient estate does not relieve it from receiving such waters from the dominant estate. Beechley v. Harms, 332 Ill. 185, 163 N. E. 387; 93 C. J. S., Waters, § 114a, p. 803. See, also, Ricenbaw v. Kraus, *supra;* Rudolf v. Atkinson, 156 Neb. 804, 58 N. W. 2d 216; Skolil v. Kokes, 151 Neb. 392, 37 N. W. 2d 616.

It is established by the evidence in the instant case that the waters involved were not diffused surface waters. They were surface waters collected and con-

centrated in volume which flowed into a depression or drainway through which they flowed in a state of nature. Such waters may not be dammed, diverted, or otherwise repelled by the proprietor of lower lands upon which they flow. The judgment of the trial court denying injunctive relief to the plaintiffs and intervener was therefore contrary to the law and the evidence. The judgment of the district court is reversed and the cause remanded with directions to enter a mandatory injunction requiring defendants to remove the embankment and to permanently enjoin the defendants from building or maintaining any structure which would interfere with the flow of surface waters through the natural depression or drainway described in the pleadings and evidence, all in accordance with the prayer of plaintiffs' petition.

REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., participating on briefs.