CLARENCE LINCH ET AL., APPELLEES, v. MILDRED NICHELSON, APPELLANT.

134 N. W. 2d 793

Filed April 30, 1965.   No. 35848.

William L. Walker and Earl Ludlam, for appellant.

Howard D. Kanouff, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

CARTER, J.

This is a suit for an injunction to restrain the defendant from collecting and casting surface waters in volume upon the lands of the plaintiffs. The trial court granted an injunction and restrained the defendant from maintaining two terraces and dams on her lands, and directing that they be removed in such manner that surface waters falling on her lands will flow in the natural course of drainage and be no longer diverted to the south onto the lands of the plaintiffs. The defendant has appealed.

The defendant is the owner of the southeast quarter of the southwest quarter of Section 14, Township 13 North, Range 5 East, Saunders County, Nebraska, which we shall hereafter refer to as the Nichelson land. The plaintiffs own the land immediately south, in Section 23, which we refer to as the Linch land. The Union Pacific Railroad right-of-way cuts across the southeast corner of defendant's lands and enters plaintiffs' lands approximately 400 feet west of their east line. Approximately

275 feet west of the center of the railroad right-of-way on the section line is a point designated C which is a pivotal point in this litigation.

Coming from the north is a small draw or drainageway which carried surface water in a state of nature into a ditch near the point where the railroad right-of-way entered plaintiffs' lands where it was carried into a creek passing under a railroad bridge some 600 or 700 feet to the south. To the west was a second drainageway carrying water in a southeasterly direction which spread out on a flat area immediately north of point C. The first drainageway drained an area of 18 acres, the second, 5 acres. This water prior to 1957 either drained into the railroad ditch directly or was conveyed there by a ditch along the section line between plaintiffs' and defendant's lands.

In 1957 defendant's predecessor in title constructed a dam 500 to 600 feet north of the section line in the first drainageway and a terrace to the southwest from the dam which had the effect of diverting the waters, or a substantial part of them, to the southwest into the section-line ditch. A similar dam and terrace were constructed in the west drainageway with similar effect. The waters thus diverted flowed into the section-line ditch which normally carried the water into the ditch on the railroad right-of-way running south into a creek. It is the contention of the plaintiffs that the diverted waters piled up at point C and flooded over onto their lands in Section 23, causing the damage thereto of which complaint is made.

Prior to the trial in the district court the dams in the two drainageways washed out. Defendant contends that thereafter the water flowed in its natural course as it flowed before the dams and terraces were constructed. The plaintiffs assert that the drainageways filled up with silt above the dams while the dams were in existence and that floodwaters continued to divert to the southwest because of the terraces after the dams

washed out. Plaintiffs contend that, as a result, flood-waters continue to pile up at point C and flood across their lands for a distance of 425 feet or so before entering the railroad right-of-way ditch or the creek to the south.

A professional engineer testified that water continued to flow along the terraces to the south and southwest after the dams washed out. The evidence of other witnesses was conflicting on this point, although the evidence for the defendant was equivocal, it being admitted by some of defendant's witnesses that a part of the drainage waters were diverted after the dams were gone. The evidence shows that water continued to pile up and spill over onto plaintiffs' lands at point C. There was evidence by one witness for defendant that prior to 1926 there was a natural drainageway from point C in a southerly direction across plaintiffs' lands. Another witness for defendant who lived on plaintiffs' lands for 12 years subsequent to 1917 testified that no water ever entered plaintiffs' lands from the north during that time. The evidence will not sustain a finding that a natural drain existed across plaintiffs' lands from point C.

The evidence of the plaintiffs is to the effect that no water spilled over on their lands prior to 1957. Since that time waters have come onto their lands, washing ditches and holes immediately south of point C and doing likewise where the water enters the ditch and creek to the south. The evidence also shows damage to crops due to these floodwaters.

The record shows that the trial judge inspected the premises before deciding the case. It must be assumed that he observed the physical facts and the evidence of the flow of the waters as shown on the ground and came to the conclusion, as shown by the memorandum opinion and judgment filed, that the evidence sustains the contention of the plaintiffs. The findings of the trial court, after an inspection of the premises when there is other evidence in the record to support them, is an important

consideration for this court. In Lackaff v. Bogue, 158 Neb. 174, 62 N. W. 2d 889, this court said: "But in a case wherein the trial court has made a personal examination of the physical facts, and where, in the same case, the oral evidence in respect of material issues is so conflicting that it cannot be reconciled, this court will consider the fact that such examination was made and that such court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite."

It is the law of this state that waters resulting from rainfall and melting snow are diffused waters which an owner may control on his own land. He may collect them, change their course, or pond them upon his land, or cast them into a natural drain without liability. He may not, however, collect such waters and divert them onto the lands of another except in depressions, draws, swales, or other drainageways through which such waters were wont to flow in a state of nature. Nichol v. Yocum, 173 Neb. 298, 113 N. W. 2d 195. The evidence supports a finding that the dams and terraces diverted surface waters from the drainageways where they naturually flowed which the terraces continued to do after the dams washed out, and caused such waters to pile up at point C and spill over onto plaintiffs' lands to their damage. This an owner may not do as the trial court correctly determined.

The trial court therefore correctly enjoined the defendant from maintaining the dams and terraces, and in directing their removal, in order to permit such surface waters to flow in the drainageway where they were wont to flow. It is fundamental that an owner may not by ditch, dam, or terrace divert surface waters in such a manner as to cast them in volume upon the adjoining lands of another to his damage. When surface waters concentrate or gather in volume or velocity, so as to lose their character as diffused surface waters, and flow in a natural drainageway, the flow may not be ar-

rested or interfered with to the injury of a neighboring proprietor. Nichol v. Yocum, *supra;* Turnell v. Mahlin, 171 Neb. 513, 106 N. W. 2d 693; Town of Everett v. Teigeler, 162 Neb. 769, 77 N. W. 2d 467.

We conclude that the evidence sustains the judgment of the district court and it is affirmed.

AFFIRMED.