MERWIN E. JAMESON ET AL., APPELLANTS AND CROSS-APPELLEES, V. GILBERT NELSON ET AL., APPELLEES AND CROSS-APPELLANTS.

318 N.W.2d 259

Filed April 16, 1982. No. 43762.

Tye, Worlock, Tye, Taylor & Hopkins, for appellants.

Jacobsen, Orr & Nelson and Jerry N. Stehlik, for appellees.

Heard before BOSLAUGH, McCOWN, CLINTON, and BRODKEY, JJ., and DEBACKER, D.J.

CLINTON, J.

This is an action in equity by the plaintiffs Jameson, who are the owners of the south half of Section 8, Township 4 North, Range 13 West of the 6th P.M., Franklin County, to enjoin the defendants Nelson, who are the owners of the north half of Section 8, Township 4 North, Range 13 West of the 6th P.M., Franklin County, from constructing a ditch or drainway along the south line of the north half of Section 8. The purpose of the ditch is to drain surface waters collected from the northeast quarter of Section 8 onto the southwest quarter of Section 8. The defendants Nelson in their answer alleged that the ditch will empty into a "natural water course or natural depression" on their own land before it drains onto the land of the plaintiffs through a continuation of that natural depression. The trial court, without making any specific findings of fact in the decree, denied injunctive relief, but retained jurisdiction "for a period of time for the purpose of monitoring the construction and performance of defendant's proposed drainage ditch and its effect, if any, on plaintiff's crop land and dams." The trial court did, however, make certain specific findings of fact in a letter to counsel after it took the case under advisement, and while it awaited trial briefs, before making its decision. We will make reference to those specific findings later in the opinion.

The principal issue in this case concerns a factual determination of whether there is a "natural depression or draw . . . wholly on the owner's [Nelson]

land'' into which the ditch would empty. "Owners of land may drain the same in the general course of natural drainage by constructing an open ditch or tile drain, discharging the water therefrom into any natural watercourse or into any natural depression or draw, whereby such water may be carried into some natural watercourse; and when such drain or ditch is wholly on the owner's land, he shall not be liable in damages therefor to any person or corporation.'' Neb. Rev. Stat. § 31-201 (Reissue 1978).

Most of the evidence is not in substantial dispute. The defendants Nelson have farmed the north half of Section 8 for more than 40 years. The defendant Gilbert Nelson has owned the northeast quarter of Section 8 since 1965 and the northwest quarter of that section since 1977. The topography of the northeast quarter is essentially flat and surface waters arising from rain and melting snow do not, except that water in an area along the north side of the quarter, naturally flow upon adjacent land. Instead, the surface waters accumulate in a number of low spots on the land and form ponds until the water evaporates or percolates into the soil. The northeast quarter does not contain any natural depression or draw which collects surface waters which then, in the natural course of drainage, flow upon other lands. The evidence indicates crops planted in the pond areas usually drown from the accumulated surface waters, and, thus, the pond areas are unproductive.

The southwest quarter, owned by the plaintiffs Jameson, in its natural state contains a depression or draw beginning near the north line of that property into which surface waters collect and flow to the south. In 1952 the Jamesons and the then owner of the northwest quarter, apparently a Gilbert Nelson ancestor, under the supervision of the Soil Conservation Service, entered into a cooperative project to construct a "ditch" which drained water from two lagoons located on the northwest quarter

into this natural depression or draw located in the Jameson southwest quarter. As part of this cooperative effort, three conservation dams were constructed in the draw upon the Jameson quarter. The evidence indicates that surface waters collect behind these dams until they reach spillway height and overflow into the draw and onto adjacent land to the south. They then flow east to the Little Blue River.

Jameson and the earthmoving contractor, Grabe, who constructed the 1952 project, testified a "cut" was made in 1952 at a point on the boundary line between the northwest quarter and the southwest quarter, permitting the two lagoons to drain into the draw on the Jameson land. This cut required the removal of 1,654 cubic yards of earth. Grabe testified the cut was made through the fence line, and the earth was spread in the lagoon areas and through the pasture. It is at the point of the cut that the proposed ditch would empty.

In February 1980 a contractor hired by Nelson began construction of the drainage project which gave rise to this action. It was partially completed when a temporary injunction suspended construction. The proposed project consisted of the ditch along the south line of the north half of Section 8 beginning at the point where the defendants contend the natural draw or depression begins and extending eastward approximately 3,000 feet. The ditch is approximately 50 feet wide at the top with the sides sloping to a flat bottom approximately 12 feet wide. The ditch is 9 feet deep at its greatest depth. It is to be located wholly upon Nelsons' land. The completed project would also contain two branch drains extending northerly from the ditch into the northeast quarter to drain the pond and lagoon areas.

Various photographs and two surveys, as well as two topographical maps made by the Geological Survey, were introduced in evidence. Two of the photographs are most significant. These photo-

graphs show views from both north and south of the boundary line between the properties at the location where the 1952 changes were made, the same location where the proposed ditch would empty and the head of the draw or depression begins. The Geological Survey topographical maps are of small scale, 1:24,000 and 1:125,000, respectively, and are not particularly helpful in determining where the draw or depression begins. The larger scale map, that is, the 1:24,000, would indicate the depression begins a slight distance north of the boundary. This map, however, was prepared in 1969 after the cut was made at the boundary line and after the 1,654 cubic yards of earth had been moved. One of the surveys made after the project began shows the elevations along and in the ditch. From survey station 6 to survey station 24, a distance of 1,800 feet, the land rises 10 feet from east to west. This, together with the uncontradicted testimony of the witnesses, indicates that no surface waters could in the "general course of natural drainage" flow from the northeast quarter to the northwest quarter nor to the depression or draw located in the southwest quarter.

Since this is an action in equity, we review the matter de novo without reference to the findings of fact made by the trial court but, where the testimony or evidence is in irreconcilable conflict, take into consideration that the trial court observed the witnesses. *Peters v. Langrehr,* 188 Neb. 480, 197 N.W.2d 698 (1972). We also take into consideration the fact that the trial court did view the premises, and we will give appropriate weight thereto. *Delp v. Laier,* 205 Neb. 417, 288 N.W.2d 265 (1980).

The following legal principles, applications of § 31-201, govern the disposition of this case. The owner of land is the owner of surface waters which fall, arise, or flow upon it, and he may retain them for his own use without liability. He may also change their course on his own land by ditch or em-

bankment, but he may not divert them upon the lands of others except in depressions, draws, swales, or other drainways through which such waters were wont to flow in a state of nature. *Nichol v. Yocum,* 173 Neb. 298, 113 N.W.2d 195 (1962). An owner of land has the right in the interest of good husbandry to drain ponds or basins thereon of a temporary character, and which have no natural outlet or course of flow, by discharging the waters thereof by means of an artificial channel into a natural surface-water drain on his own property, and through such drain over the land of another proprietor in the general course of drainage in that locality, even though the flow in such natural drain is thereby increased over the lower estate, and provided that this is done in a reasonable and careful manner and without negligence. *Pospisil v. Jessen,* 153 Neb. 346, 44 N.W.2d 600 (1950). While the flow of surface waters in a natural depression, draw, swale, or other natural drainway may be temporary and occasional, the course which they uniformly take is the controlling factor. *Nichol v. Yocum, supra.* It is the law of this state that waters resulting from rainfall and melting snow are diffused waters which an owner may control on his own land. He may collect them, change their course, pond them upon his land, or cast them into a natural drain without liability. He may not, however, collect such waters and divert them onto the lands of another except in depressions, draws, swales, or other drainageways through which such waters were wont to flow *in a state of nature. Delp v. Laier, supra.*

Jameson testified that prior to 1952 and the making of the cut, no water from the northwest quarter of Section 8 flowed into the draw on his land. This testimony was corroborated by Grabe who did the earthmoving in connection with the 1952 project. The latter testified that he made the cut through the fence line and removed 2 or 3 feet of earth at that

point. He did not alter the surface on Jamesons' side of the land. Both of these witnesses testified that before the cut was made, no natural depression or drainway existed at that point in the northwest quarter of Section 8. Conversely, Gilbert Nelson testified the natural depression did extend into the northwest quarter and did begin on his land. However, he also testified with reference to the 1952 work: "I don't even recall what was done." The surveyor who prepared the survey after the 1980 project began testified he was not competent to determine whether the depression on the north side of the fence line into which the ditch would empty was natural or man made. The photograph which shows this area indicates that it is a tilled field. This photograph also shows a shallow, irregular wash running through the cultivated field in the area where the 1952 cut was made. The shallow wash runs from the north to the south toward the point where the present ditch ends. It is not possible to determine the depth of this wash from the photograph, but it appears that tilling machinery would obliterate the wash until an adequate accumulation of waterflow causes the wash to reappear.

On trial de novo we can see no reason to disbelieve the positive testimony of Jameson and Grabe that no natural depression existed extending into the northwest quarter at the time the earth was moved in 1952 and that no water from that quarter flowed into the head of the draw on the Jameson land before the cut was made. Gilbert Nelson's testimony, taken in context, is inconclusive. The two photographs to which we have referred reinforce our conclusion.

The findings made by the trial court in the letter to which we have earlier made reference indicate the following:

"2. That the original cut on the Jameson land in 1952 was to provide drainage of lagoons on the Nelson land directly to the north of the cut;

"3. That water did not drain to the south at the place of the cut prior to the cut being made;

"4. That the new ditch will increase drainage flow through the old cut;

"5. That the three dam structures in the draw below the cut do not have sufficient capacity to hold the additional drainage;

"6. That this presents a danger to the crop land of the plaintiff below the dam sites."

Jameson testified the increased flow would wash out the dams in times of heavy rain, while an employee of the Soil Conservation Service testified that insufficient data existed from which it could be concluded the dams would be damaged by the increased flow.

We conclude a natural depression or draw into which surface waters were wont to flow in a state of nature does not exist at the point on the defendants' land where the proposed ditch empties. We hold, therefore, that the defendants are not entitled to drain the ponds and other surface waters from the northeast quarter of Section 8 into the draw on the southwest quarter of Section 8.

Defendants have filed a cross-appeal, asking that they be awarded damages for the cost of defending the injunction action in the court below. The cross-appeal must fail with our reversal of the trial court's judgment on the main issue.

We think it appropriate at this time to specifically point out a possible ground of decision on which we do not rule. Section 31-201 says: "Owners of land may drain the same *in the general course of natural drainage by constructing an open ditch* . . . ." (Emphasis supplied.) As we have pointed out, without the proposed ditch none of the surface waters from the northeast quarter of Section 8 would ever reach the point where the proposed ditch empties even if at that point there were a natural depression. There is language in some of the cases which would indicate

that the use of manmade ditches and drains may not be used to divert water in a different direction so that the flow goes into a natural drainway which it would not otherwise reach. *Flesner v. Steinbruck,* 89 Neb. 129, 130 N.W. 1040 (1911); *Rudolf v. Atkinson,* 156 Neb. 804, 58 N.W.2d 216 (1953); *Ricenbaw v. Kraus,* 157 Neb. 723, 61 N.W.2d 350 (1953); *Schomberg v. Kuther,* 153 Neb. 413, 45 N.W.2d 129 (1950); *Bussell v. McClellan,* 155 Neb. 875, 54 N.W.2d 81 (1952); *Delp v. Laier, supra.* We do not deem the facts of this case appropriate on which to decide the meaning of "in the course of natural drainage," because no substantial amount of the surface waters in this case have any natural direction of flow and because this case involves ponded waters. It is not a case where waters are to be diverted from one natural drainway into which they naturally flow to another natural drainway which they could not reach except for the ditch.

We reverse the decision of the trial court and remand for entry of a decree granting appropriate relief in accordance with this opinion.

REVERSED AND REMANDED.

McCOWN, J., dissenting.

The majority opinion in this case holds in effect that no watercourse, depression, or drain, part of which is man made, can ever become a "natural" watercourse, depression, or draw within the meaning of Neb. Rev. Stat. § 31-201 (Reissue 1978), no matter how long it has been established. Such a watercourse apparently remains an artificial or unnatural watercourse forever.

In view of modern soil and water conservation practices, which constantly affect changes in the course of natural drainage, it seems strange indeed to hold that manmade changes in drainage can never be treated as "natural" for purposes of § 31-201. It seems equally anomalous that granted or prescriptive drainage rights should be confined to

the purposes supposedly intended by the grantor at the time of the initial acquisition of the right.

In this case there is no dispute but that the plaintiffs or their predecessors granted to the defendants the right to construct a portion of the original watercourse involved in 1952. That watercourse was established and used by the defendants for almost 30 years prior to the institution of this lawsuit. Under the majority opinion that watercourse, although established and continued for that period of time under actual or prescriptive right, can never become a natural watercourse within the meaning of § 31-201.

In my view the judgment of the trial court refusing injunctive relief should have been affirmed.